**In re FAIRMONT COMMUNICATIONS CORPORATION, et al., Debtors.**

**Bankruptcy No. 92 B 44861 (JLG).**

United States Bankruptcy Court,
S.D. New York.

May 17, 1993.

Dewey Ballantine by Stuart Hirshfield, New York City, for debtor.

Weil, Gotshal & Manges by Alan B. Miller, New York City, for Prudential Private Placement Funding, Inc.

Rogers & Wells by Dennis J. Drebsky, New York City, for Price Communications Corporation.

Phillips, Lytle, Hitchcock, Blaine & Huber by William J. Brown, New York City, for Marine Midland Bank, N.A., individually and as agent.

## MEMORANDUM DECISION AND ORDER ON DISPUTE REGARDING TURNOVER OF CONFIDENTIAL INFORMATION

JAMES L. GARRITY, Jr., Bankruptcy Judge.

Fairmont Communications Corp. ("Fairmont") is a holding company whose assets consist of 100% of the outstanding stock of Bay Broadcasting Corporation ("Bay Broadcasting"), Ward Broadcasting Corporation ("Ward Broadcasting"), Renaissance Broadcasting Corporation ("Renaissance Broadcasting"), Southwest Radio Corporation ("Southwest Radio") and Rogue Broadcasting Corporation ("Rogue Broadcasting") (these entities will be referred to as the "Subsidiaries"). The Subsidiaries are engaged in the business of owning and operating AM and FM radio stations in various geographic locations throughout the United States. Together with each of these subsidiaries (collectively, the "debtors"), Fairmont is a debtor-in-possession herein.

On August 28, 1992 (the "Filing Date"), debtor filed with this Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. By Order dated August 31, 1992, we directed that these Chapter 11 cases be administratively consolidated. Pursuant to §§ 1107(a) and 1108 of the Code, each debtor is continuing to operate its business and manage its property as debtor-in-possession. No trustee or examiner or committee of unsecured creditors has been appointed in these cases.

The debtors' principal creditors are Marine Midland Bank, N.A. ("Marine"), individually and as agent for NationsBank, N.A., National Westminster Bank USA, and Barclay's Business Credit, Inc. (the "Banks"), Prudential Private Placement Funding, Inc. ("Prudential"), as successor-in-interest to Prudential Bache Interfunding, Inc. and Price Communications ("Price"). The Banks' pre-petition claim totals approximately $59 million and is secured by a lien on the assets of Fairmont and each Subsidiary. Prudential has a pre-petition claim totalling approximately $29 million which is secured by a subordinate lien on the assets of Fairmont. Price is owed approximately $95 million.

On or about January 4, 1993, the Banks proposed a plan of reorganization for the Subsidiaries and submitted a disclosure statement with respect to that plan. On January 23, 1993, Prudential filed its own plan for the Subsidiaries and Fairmont which provided for different treatment of the debtors' creditors and equity security holders. It likewise filed a disclosure statement relating to that plan. The Banks and Prudential (collectively, the "Proponents") resolved their differences and on or about April 20, 1993, they filed a First Amended Plan of Reorganization (the "Amended Plan") which amends and restates their respective plans. Additionally, they filed a disclosure statement for that plan.

The Amended Plan contemplates the post confirmation liquidation of the Subsidiaries, either through asset or capital stock sales, pursuant to a marketing plan run by a court appointed Sales Agent with the sales proceeds being distributed in accordance with the classification scheme set forth in the plan. In connection with the formulation of the Amended Plan, the Banks and

Prudential executed an Intercreditor Agreement. Among other things, that agreement provides for the redistribution between the Banks and Prudential of payments which each party will receive under the Amended Plan, and for the establishment of a Steering Committee to review any proposed sale of the Subsidiaries' assets or capital stock. The Steering Committee will consist of 5 individuals designated by Proponents and appointed by order of the court. Under the Intercreditor Agreement, the Steering Committee cannot approve an asset or stock sale below the so-called "Upset Price", which the Proponents maintain is equivalent to fair market value. Moreover, even if that minimum price is met, Prudential's designee on the Steering Committee has the unilateral right to veto the sale if the price does not meet the so-called "Strike Price". The Intercreditor Agreement sets forth individual Strike Prices for each Subsidiaries' assets or capital stock and an aggregate Strike Price for all of the Subsidiaries' assets and capital stock. Under the plan, the court will be asked to fix the Upset Price and to authorize the Steering Committee to act in accordance with the Intercreditor Agreement. The Amended Plan contemplates that the Upset Prices will remain under seal and confidential until the plan is consummated.

We fixed May 10, 1993, as the date for the hearing on the adequacy of the Proponents' disclosure statement. On or about May 5, 1993, Price served and filed its 44 page objection to that document. On May 7, 1993, the Proponents served and filed their 52 page reply to Price's objection which they thereafter amended by a document filed on May 10, 1993. Price argued that the disclosure statement did not satisfy § 1125 of the Code because, among other things and without limitation, it failed to specify the Upset or Strike Prices or otherwise provide information respecting the Proponents' appraisal of the value of the Subsidiaries' assets. This information is particularly relevant to Price because the Proponents concede that if their estimates on the Subsidiaries' value are accurate, Price will not receive any distribution under the Amended Plan. In their reply,

Proponents advised that they had detailed appraisals (the "Appraisals") of the assets which they will utilize in fixing the Upset and Strike Prices. They further advised that they would make that information available to Price, provided that Price agreed to keep the information confidential. At the May 10 hearing, Proponents submitted their written request pursuant to § 107(b) of the Code and Bankruptcy Rule 9018 for an order directing the Clerk of the Court to file under seal (i) the Intercreditor Agreement (which includes the Strike Prices); (ii) a list of the Upset Prices; and (iii) the Appraisals (hereinafter, those documents collectively will be referred to as the "Confidential Information"). The debtors and Price consented to this relief, and we entered an order directing that those documents be filed under seal. The order also directed the Proponents to make the Confidential Information available to the debtors, Price and the Office of the United States Trustee, provided that each entity not disclose any of that information. On the basis of that order, Proponents agreed to make the Confidential Information immediately available to Price.

On May 11, 1993, Price made an offer (the "Price Offer"), to purchase all of the assets of two of the Subsidiaries: Bay Broadcasting and Ward Broadcasting. Throughout this case, Price has been represented by the law firm of Rogers & Wells ("R & W"). Accordingly, Dennis J. Drebsky, Esq., a R & W partner, immediately informed counsel for the Proponents that the bid had been made and advised that Price would not seek access to the Confidential Information until the merits of the Price Offer were considered. The following day, the Price Offer was rejected, and Mr. Drebsky renewed Price's request for turnover of the Confidential Information. The Proponents agreed to supply that information on the condition that Price be disqualified from future bidding on the Subsidiaries' assets. That condition proved unacceptable to Price, and Price submitted the following counter-proposal: (1) Proponents will supply the Confidential Informa-

tion to R & W, which will not share that information with Price; (2) R & W will use the information in reviewing the Amended Plan, and if necessary, file objections to the plan on Price's behalf; (3) Price will retain the law firm of Akin, Gump, Strauss, Hauer & Feld, L.L.P. ("Akin Gump") to represent it in any future bidding on the Subsidiaries' assets; and (4) Akin Gump will not be given access to the Confidential Information. The Proponents rejected this counter-proposal.

During the afternoon of May 13, 1993, the parties telephoned Chambers to request the court to conduct a conference call to discuss this dispute. At some point during that day, Mr. Drebsky wrote to the court on this matter. Late that afternoon, we held the conference call during which the parties explained their respective positions. Because we had not received Mr. Drebsky's letter at the time of the call (and did not actually receive it until May 14), we agreed to reconvene the group by telephone on May 14, 1993. In the interim, and on May 14, we received a letter from Banks' counsel in further support of their position. We have reviewed both submissions. During our May 14 telephone conference, we advised the parties that we respectfully disagreed with the position advanced by Price and directed that Price not be given access to the Confidential Information unless Price agreed to forego the right to bid on any of the Subsidiaries' assets in the future. At the parties' request, we are submitting this memorandum to more fully explain the rationale for our decision.

 It is incumbent upon the Bankruptcy Court to insure that plan sanctioned asset sales are conducted free from any taint of fraud, mistake or similar defect. *See generally Ross v. Kirschenbaum (In re Beck Indus., Inc.)*, 605 F.2d 624 (2d Cir.1979). Indeed, "[w]here the integrity of [the bankruptcy sale] process has been impugned, the bankruptcy courts may set aside their own orders pursuant to equitable principles." *C & J Clark Am., Inc. v. Carol Ruth, Inc. (In re Wingspread Corp.)*, 92 B.R. 87, 93 (Bankr.S.D.N.Y.1988) (citing *Lindsey v. Department of Labor (In re Harris Management Co.)*, 791 F.2d 1412, 1415 (9th Cir.1986)).

 Without commenting on the confirmability of the Amended Plan, it is plainly apparent that the plan's viability will be severely undercut, if not destroyed, if the Upset or Strike Prices are disclosed to any party interested in bidding on all or part of the Subsidiaries' assets or their capital stock. Armed with that information, the bidder naturally will attempt to pay no more than the Proponents contend the assets are worth, thereby potentially depressing the price that those assets will fetch.

Prior to the filing of these Chapter 11 cases, the Banks, Prudential and Price unsuccessfully attempted to effect an out of court work out of their respective positions. Those efforts have continued without success post-petition. A representative of Price sits on Fairmont's Board of Directors, and since the Filing Date, Price has played an active role in these cases. We have no reason to doubt that R & W would use its best efforts to guard against the disclosure of the Confidential Information to Price, if that information is provided to R & W. However, we cannot envision how R & W will be in a position to object to the Amended Plan without taking Price's view on acceptable asset values into account in formulating that objection. As such, it seems clear to us that Price will be in a position to gauge the values attributed by the Proponents to those assets, without getting direct access to those values. Thus, Price potentially will enjoy a bidding advantage for those assets. That kind of advantage may stifle competitive bidding and undermine the integrity of the asset sales called for by the Amended Plan. *See generally Gross v. Russo (In re Russo)*, 762 F.2d 239 (2d Cir.1985); *In re Grodel Mfg., Inc.*, 33 B.R. 693 (Bankr.D.Conn. 1983).

For all of the foregoing reasons, we hold that Price should not be given access to the Confidential Information unless it waives its right to bid on the Subsidiaries' assets or capital stock in the future.

It is so ordered.