In re WINGSPREAD
CORPORATION, et al., Debtor.

C & J CLARK AMERICA,
INC., Plaintiff,

v.

CAROL RUTH, INC., Defendant.

Bankruptcy No. 87 B 10618–10630.
Adv. No. 88–5772A.

United States Bankruptcy Court,
S.D. New York.

Oct. 18, 1988.

Winick & Rich, P.C., by Jeffrey Rich, New York City, for C & J Clark America, Inc.

Daniel A. Zimmerman, New York City, for Carol Ruth, Inc.

Fried Frank Harris Shriver & Jacobson, by Gerald C. Bender, New York City, for the debtors.

Hahn & Hessen, by George A. Hahn, New York City, for Committee of Unsecured Creditors.

Kreindler & Relkin, by Bruce Nathan, New York City, for NCNB National Bank.

MEMORANDUM DECISION ON APPLICATION FOR INJUNCTION OR STAY

TINA L. BROZMAN, Bankruptcy Judge.

Fortunately, since the issuance of the decision by our circuit court of appeals in *Ross v. Kirschenbaum (In re Beck Industries, Inc.)*, 605 F.2d 624 (2d Cir.1979), it is indeed rare that the bankruptcy court is confronted with an assertion that the integrity of an auction sale which it held was tainted by the conduct of a fiduciary who was a bidder for the estate's assets. This, unfortunately, is one of those rare cases. A preliminary injunction is sought to per-

mit this court an opportunity to consider whether the fiduciary purchased from the estate a particular claim the existence of which was never disclosed in the debtor's schedules and statement of affairs signed by that fiduciary and, if the fiduciary did purchase the claim, whether the sale should be set aside.

I.

A.

Wingspread Corporation (Wingspread) and its 13 wholly owned subsidiaries were engaged in manufacturing and marketing of a broad variety of apparel products. On April 8, 1987, Wingspread and 12 of its 13 subsidiaries (the Debtors) filed chapter 11 petitions with this court and were continued in operation of their businesses and possession of their property. Efforts to obtain an equity infusion or ongoing permanent financing were not successful. Over the course of time, as the Debtors sold the assets of a number of their businesses to alleviate their financial hemorrhaging, it became apparent that, at best, a liquidating reorganization would occur. Even that was ultimately out of reach; there were insufficient monies on hand to pay all administrative creditors in full on confirmation of a plan, and those creditors and the secured creditors were unable to agree on the terms of a plan which would have divided the assets among them. On October 3, 1988, after the record on this motion was closed, all of the Debtors' cases were converted to chapter 7 liquidations.

B.

The cast of characters in this unfolding drama is headed by Norman Hinerfeld (Hinerfeld), who was the chairman of the board of directors and chief executive officer of Wingspread. It was Hinerfeld who executed the Debtors' chapter 11 petitions and their schedules and statement of affairs. A number of corporations of which Hinerfeld is a principal figure prominently. The first is HDZ Corporation (HDZ), which made a written proposal to the Debtors and their Committee of Unsecured Creditors (the Committee) to purchase certain assets

of the estates. The actual bid was made by another Hinerfeld entity, Pandora Industries, Inc. (Pandora Industries), as successor to HDZ. Title to the assets on which Pandora Industies bid was taken by a third Hinerfeld entity, Carol Ruth, Inc. (CRI), the defendant in this adversary proceeding. CRI's counsel represented to the court that CRI is a group composed of Pandora Industries, a Mr. Paul Jones and a Mr. William Shasky. The plaintiff in this adversary proceeding is C & J Clark, Inc. (Clark), also a purchaser of assets from the Debtors. Clark had a pre-existing relationship with one of the Debtors, Champion Pants, Inc. (Champion), pursuant to which Champion sold certain goods to Clark.

C.

By order to show cause dated April 8, 1988, the Debtors moved for a hearing pursuant to sections 363 and 365 of the Bankruptcy Code, 11 U.S.C. §§ 363 and 365, authorizing and approving the sale to HDZ, subject to higher and better offers, of certain of the Debtors' assets and assumption of certain of the Debtors' leases and executory contracts. The assets included in the notice of sale constituted substantially all the assets then remaining in the Debtors' estates other than claims and causes of action under 11 U.S.C. §§ 544, 545, 547, 548, 549 and 553(b) and comparable state law provisions; intercompany accounts receivable; and the Debtors' interest in certain real estate located in Seymour, Indiana. During the hearing to approve the sale of the assets and assumption of leases (the First Sale), requests were made for clarification of the assets being sold and objections were interposed. Gulf and Western, Inc. (G & W)[1] sought certain relief with respect to leases contemplated to be sold and Clark objected to the inclusion in the sale of the Debtors' rights under certain agreements and patent licenses for the manufacture, use or sale of certain goods known as "Prequal material" and the related molds and dyes. Clark's interest in the sale stemmed from its commitment in a license agreement dated February 1, 1985 (the Pacer Licensing Agree-

ment) to purchase certain minimum quantities of Prequal material. The Debtors' rights under the agreements and licenses relating to the Prequal material and a contract dated February 1, 1985 between Clark, as purchaser, and Kayser–Roth Corporation, predecessor in interest to Champion, as seller, together are known by the parties as the "Pacer Assets." In addition, there was raised an issue of whether certain real property leased and located in Youngstown, Ohio could be sold in light of the admission that Hinerfeld had failed to transmit to the Committee of Unsecured Creditors an offer or expression of interest by a third party in purchasing that lease.

In an effort to allow the sale to proceed notwithstanding the various objections interposed, the parties in interest, including Pandora Industries, met in chambers with the court and agreed to certain amendments to the lists of assets to be sold (and to a reduction in the price offered by Pandora Industries). Among other things, it was agreed that the Pacer Assets and the Youngstown property would be removed from the First Sale. The amendments were announced at the First Sale. Pandora Industries was the successful purchaser.

An amended order was entered May 5, 1988 approving the sale to Pandora Industries. That order (the First Order) specifically carved out from the sale the assets which the record reflected would be removed. Specifically, the First Order provides so far as pertinent:

ORDERED that, notwithstanding anything contained in the Agreement and the Motion, the Assets to be sold and the Leases to be assumed and assigned *shall not include* the following: (1) the lease agreement covering certain premises located at Crescent Street, Youngstown, Ohio, dated November 1, 1970, by and between the County of Mahoning, Ohio, as lessor, and Champion Pants, Inc., as lessee; (ii) *all of the Debtors' right, title and interest in and to the agreement dated February 1, 1985, by and between C & J Clark America, Inc., as purchaser, and Kayser–Roth Corporation,*

---

1. G & W had guaranteed payment of the Debtors' obligations under certain leases.

*predecessor in interest to Champion Pants, Inc., as seller, together with all the Debtors' right, title and interest in and to the patent license to manufacture, have manufactured, use or sell the Prequal material referred to therein and all related molds and dyes (the "Pacer Assets");* and (iii) all bank accounts, bank balances, cash, cash accounts, cash balances, escrowed funds in the Debtors' estates, pension plans, and any over-funding of pension plans (but credit balances at the factor shall still be included); (emphasis added)

With the agreement of the parties, and in accordance with the amended terms of the First Sale, the First Order also augmented the list of causes of action excluded from the sale. Whereas the notice of sale had provided that so-called avoidance actions under the Bankruptcy Code were not being sold, the First Order removed from the assets sold *all* claims and causes of action other than a claim or cause of action relating to the assets and leases identified in the agreement of sale or previously sold pursuant to an earlier sale of assets of one of the Debtors. The First Order provides:

ORDERED that *the claims and causes of action* in paragraph 2 of the Agreement *designated as excluded* from the Assets to be purchased *shall be expanded to include any and all claims and causes of action of the Debtors or any of the Debtors' estates against any person or entity, including but not limited to, all claims and causes of action under* any section of the Bankruptcy Code or *any other applicable law; provided however*, that Pandora Industries and/or its designee will acquire any claims or causes of action relating to (i) any asset specifically purchased pursuant to lettered paragraphs 1(a) through 1(i) of the Agreement and the Leases transferred pursuant to paragraph 6 of the Agreement, as modified by this Order; and (ii) pursuant to lettered para-

graphs (a) through (e) of the offer by letter dated March 7, 1988 for the purchase of the assets of Pandora Sportswear, Inc., as approved by this Court by order dated April 8, 1988. (emphasis supplied)

As contemplated by the interested parties at the First Sale, a second sale was scheduled. By order to show cause dated June 7, 1988, the Debtors moved for a hearing pursuant to sections 363 and 365 of the Code authorizing and approving the sale, assignment and transfer, subject to higher and better offers, of the Pacer Assets (the Second Sale). Pandora Industries objected to the sale on the basis that the terms of the sale could be read to encompass a purported claim in the approximate amount of $315,000 against Clark (the Clark Claim), arising from the alleged failure of Clark to purchase the minimum required amount of Prequal material pursuant to the Pacer Licensing Agreement, which claim Pandora Industries urged it had earlier purchased as part of the assets sold at the First Sale. Pandora Industries accordingly objected to the sale proceeding without a clarification of ownership. There is no dispute that the Clark Claim was not listed on the Debtors' schedules and statements of affairs which were signed by Hinerfeld. Similarly, there is no dispute that the existence of the Clark Claim was not made known to the court at the First Sale or at any time prior to the filing of the objection to the Second Sale.[2]

The Debtors and the Committee took the position at the Second Sale that whatever interest the Debtors had in the Clark claim, if any, was excluded from the assets sold at the First Sale by the plain terms of that sale as confirmed by provisions of the First Order relating to excluded assets. The Debtors and the Committee urged that even if the court ruled that the assets sold to Pandora Industries pursuant to the First Sale could be found to include the Clark Claim, Hinerfeld, at the time that he was

**2.** There is a dispute as to whether the Committee was informed, directly or indirectly, of the existence of the Clark Claim at some time before the First and Second Sales. The Committee and the Debtors contend that they had no knowledge of the Clark Claim; Pandora Industries contends that the Committee was generally aware of it. The Committee also contends that the Clark Claim is not entered in any of the Debtors' books and records.

still chairman of the board of directors and chief executive officer of the Debtors, had failed in his duty to disclose the existence, amount and value of the Clark Claim prior to the First Sale and that this constituted a deliberate concealment for his own self-interest of material facts and conduct in fraud of the creditor body.

The parties' attempts, both with and without the assistance of the court, to resolve the dispute respecting the Clark Claim were unsuccessful. Over the objection of Pandora Industries and CRI (but with support of the Debtors, the Committee, the Debtors' secured lender and G & W) the court authorized the sale to proceed, finding that the immediate sale of the Pacer Assets was necessary and essential to avoid the rapid and substantial diminution of the value of the assets and because the sale and assignment of the Pacer Assets would create a substantial benefit to the Debtors' estates. This authorization was granted on the basis that (i) there would be promptly brought on before the court an appropriate proceeding to determine whether the Clark Claim had been transferred to Pandora Industries pursuant to the First Sale; (ii) the proceeds of the sale of the Pacer Assets would be held in escrow pending that determination; (iii) the Debtors and the Committee agreed to the grant of a limited recourse indemnification of Clark against successful recovery upon the Clark Claim by Pandora Industries; and (iv) the Debtors agreed that if they retained the Clark Claim, it would be transferred to the successful bidder at the Second Sale. These amendments to the sale terms were announced at the Second Sale. After competitive bidding, Clark was declared the successful purchaser for the sum of $350,-000.

An order confirming the sale was entered July 15, 1988 (the Second Order). As originally drafted and presented to the court, the Second Order would have provided that this court has and retains sole and exclusive jurisdiction to resolve disputes among the Debtors, Clark and Pandora Industries relating to the sale of the Pacer Assets. At Pandora Industries' request, the inclusion of Pandora Industries in that provision of the order was struck. Although Pandora Industries and/or CRI have appealed from the Second Order, the sale has been consummated.

On July 26, 1988, eleven days after entry of the Second Order, CRI filed in the United States District Court for the Southern District of New York a complaint against Clark, seeking recovery on the Clark Claim (the Clark Action). Significantly, the damages sought are $594,750, which is far in excess of the amount represented by Pandora and CRI at the time of their objection to the Second Sale as the approximate amount of the Clark Claim. No service was effected on Clark until September 7, 1988. Meanwhile, by notice dated August 11, 1988, the Committee moved for a determination of the ownership of the Clark Claim, suggesting that even if CRI had purchased the Clark Claim, the sale was tainted by Hinerfeld's fraud. Clark, having learned of the Clark Action, commenced this adversary proceeding for an injunction and by order to show cause sought to compel CRI to discontinue the Clark Action or, alternatively, to preliminarily enjoin CRI from proceeding with that Action and to assess costs, expenses and attorneys' fees against CRI pursuant to 28 U.S.C. § 1927 for unreasonably and vexatiously multiplying the proceedings.

CRI moved to dismiss the Committee's motion and opposed the relief sought by Clark. Because it was impossible to ascertain from the face of the motion whether the Committee was seeking relief under Fed.R.Bankr.P. 9024 and the correlative Fed.R.Civ.P. 60(b) or was seeking a declaratory judgment, and because conversion of the Debtors' cases appeared imminent (so that a trustee would be appointed who would inherit the litigation), the court granted the motion to dismiss on procedural grounds without prejudice to institution of an appropriate motion or adversary proceeding (depending on the nature of the relief sought).

At the hearing on Clark's motion, the Committee orally supported the requested preliminary injunctive relief. This opinion deals with that request. CRI contends

principally that this court has no jurisdiction to grant an injunction or, even if there is jurisdiction, that the standards for the issuance of a preliminary injunction have not been met. The court concludes that it does have jurisdiction and that an injunction is essential in aid of that jurisdiction. The court rejects the argument that this dispute is one between third parties unrelated to the administration of the Debtors' estates. Because the proceeds from the Second Sale are in escrow and the Debtors have given Clark a limited indemnification, resolution of the ownership of the Clark Claim will have a real impact upon the administration and liquidation of the Debtors' estates. The court also rejects Clark's alternative request for relief, an order compelling CRI to discontinue the Clark Action. Should CRI prevail in this court, the continuation of that litigation may be appropriate.

## II.

What CRI has attempted is an end run. Although the Second Sale proceeded on condition that an appropriate proceeding be commenced here to determine whether the Clark Claim was sold at the First Sale or the Second, CRI, which has never been declared the owner of that claim, commenced suit upon it in the district court—for an amount almost twice the amount which CRI represented as its approximate worth when objecting to the Second Sale. One could construe the suit in the district court as an effort by CRI to thwart any inquiry into the *bona fides* of the First Sale and to prevent this court from declaring the meaning of its own order. But regardless of CRI's motive, were it to succeed in wresting this conflict away from the court before which both sales were conducted, the integrity of the bankruptcy sale process would be seriously undermined.

The bankruptcy court has broad equitable powers to protect and preserve its own jurisdiction. "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). So broad is the court's power

pursuant to section 105(a) that even where the Code states that an issue is to be raised by a party in interest, the statute may not be construed "to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." 11 U.S.C. § 105(a).

■ The usual grounds for injunctive relief such as irreparable injury need not be shown in a proceeding for an injunction under section 105(a). *LTV Steel Company, Inc. v. Board of Education (In re Chateaugay Corporation)*, 93 B.R. 26, 29 (S.D.N.Y.1988); *Johns–Manville Corporation v. Colorado Insurance Guaranty Association (In re Johns–Manville Corporation)*, 91 B.R. 225, 227–28 (Bankr. S.D.N.Y.1988); *Garrity v. Leffler (In re Neuman)*, 71 B.R. 567, 571 (S.D.N.Y.1987); *see Henderson v. Burd*, 133 F.2d 515, 517 (2d Cir.1943). A bankruptcy court may enjoin proceedings in other courts when it is satisfied that the proceedings would defeat or impair its jurisdiction with respect to a case before it. *LTV*, at 29, citing *In re Johns–Manville Corp.*, 26 B.R. 420, 425 (Bankr.S.D.N.Y.1983), *aff'd*, 40 B.R. 219 (S.D.N.Y.), *rev'd in part*, 41 B.R. 926 (S.D.N.Y.1984); *see Continental Illinois National Bank v. Chicago*, 294 U.S. 648, 675, 55 S.Ct. 595, 605–06, 79 L.Ed. 1110 (1935); *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 1008 (4th Cir.), *cert. denied*, 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986).

■ The federal courts have long been concerned with the integrity of the bankruptcy sale process. Mindful of the need to engender stability and integrity of the sale process, the bankruptcy courts will uphold regularly conducted sales unless they are tinged with fraud, error or similar defects which would in equity affect the validity of any private transactions. *In re General Insecticide Co., Inc.*, 403 F.2d 629, 630–31 (2d Cir.1968); *In re Todem Homes, Inc.*, 51 B.R. 883, 888 (Bankr.S.D.N.Y. 1985). But where the integrity of that process has been impugned, the bankrupt-

cy courts may set aside their own orders pursuant to equitable principles. *Lindsey v. Department of Labor (In re Harris Management Co., Inc.)*, 791 F.2d 1412, 1415 (9th Cir.1986).

Sales to fiduciaries are necessarily subjected to heightened scrutiny because they are rife with the possibility of abuse. As the Second Circuit explained when it affirmed a decision of the district court to set aside a sale to the president of one of the debtor's subsidiaries, the rules governing the conduct of fiduciaries pervade bankruptcy administration. *Beck Industries*, 605 F.2d at 634. In *Gross v. Russo (In re Russo)*, 762 F.2d 239 (2d Cir.1985), the Second Circuit reversed the bankruptcy judge's determination that a former trustee was *per se* disqualified from purchasing estate assets but remanded to the bankruptcy judge to determine whether there was any impropriety on the part of the former fiduciary in bidding at the sale. As the court stated:

> In this case, there has been no suggestion in the opinions below of any fraud or unfair dealing. However, a factual record should be established. Since a "bankruptcy court sits as a court of equity," *Beck Industries*, 605 F.2d at 634, it is of course appropriate for the court to consider whether the former fiduciary's bid or purchase tainted the proceedings with wrongdoing, *cf. Donovan & Schuenke [v. Sampsell]*, 226 F.2d [804] at 811, [ (9th Cir.1955) ] or stifled competition for the asset, *see Beck Industries*, 605 F.d at 636, *or whether the former fiduciary promulgated any impropriety, see Mintiner v. Michigan Nat'Bank*, 117 Mich.App. 633, 324 N.W.2d 110 (Mich.Ct.App.1982); *Tognazzini v. Tognazzini*, 125 Cal.App.2d 679, 271 P.2d 77, 85 (1954). *The integrity of the sale is the issue to be addressed*—not any general past conduct of a bidder in relation to other matters. (Emphasis supplied) 762 F.2d at 243.

Since this court is unequivocally empowered to set aside its own order if the fiduciary promulgated any impropriety, it is empowered pursuant to 11 U.S.C. § 105(a) to issue an injunction to preserve its ability to make the necessary inquiry. The law under the correlative section 2a(15) of the former Bankruptcy Act was unequivocal on this point. Jurisdiction to administer the estate, once it attached, drew to the court the power to protect the estate against waste or fraud and also against all proceedings impinging upon the equitable administration of the estate; suits in other courts could be enjoined if they hampered bankruptcy, such as when there was a basis for fear that they would be used to "render fraud triumphant" or to defeat the equality of creditors. *Reconstruction Finance Corp. v. Lustron Corp. (In re Lustron Corp.)*, 184 F.2d 789, 794 (7th Cir.1950), *cert. denied*, 340 U.S. 946, 71 S.Ct. 531, 95 L.Ed. 682 (1951); *see Steelman v. All Continent Corp.*, 301 U.S. 278, 57 S.Ct. 705, 709, 81 L.Ed. 1085 (1937) (bankruptcy court armed with power to enjoin prosecution of suit in another federal court upon grounds that suit, if litigated to its conclusion, might thwart inquiry into frauds charged against the bankrupt or make relief against the frauds difficult); *cf. In re Matthews Manufacturing Company*, 183 F.Supp. 677, 678 (D.Mass.1960) (bankruptcy court properly determined ownership of plan and drawings contained in safe sold at auction where ownership was claimed by purchaser of safe, purchaser of molds and dies to which plans and drawings pertained, and bankruptcy trustees.)

■ Here it has been alleged that Hinerfeld perpetrated a fraud sufficient to require revisiting of the First Order. Given the undisputed facts that (i) Hinerfeld was a fiduciary of these Debtors; (ii) Hinerfeld, through a corporate vehicle, was purchasing the Debtors' assets; (iii) the Clark Claim was not listed in the Debtors' schedules; (iv) Hinerfeld executed those schedules; (v) Hinerfeld did not reveal to the court the existence of or his claim to own the Clark Claim until the eve of the Second Sale; and (vi) Hinerfeld, through a corporate vehicle, commenced suit on the Clark Claim in an amount far in excess of the amount represented to be the approximate value of that claim, there is enough to warrant an inquiry into the propriety of the

First Sale. An injunction is necessary to aid this court in conducting that inquiry. The threshold question in the Clark Action is the ownership of the Clark Claim. That issue cannot be resolved without consideration of the alleged fraud on this court and the creditors. In view of the importance of maintaining the integrity of judicial sales, particularly those to fiduciaries, an injunction under section 105(a) should issue to permit the necessary inquiry.

The court's power under section 105(a) is not circumscribed by a *res.* The basic purpose of the section is to enable the court to do whatever is necessary to aid its jurisdiction, in other words, anything arising in or relating to a bankruptcy case. 2 L. King, *Collier on Bankruptcy,* ¶ 105.02 at 105–3 (15th ed. 1988). Whereas the Debtors disclaim any interest in the Clark Claim, they have indemnified Clark, with the approval of this court, against the possibility that CRI will recover on the Clark Claim. This limited indemnification arose out of the post-petition administration of the Debtors' estates and will have a substantial and real impact upon that administration, since the proceeds of sale are being held in escrow until resolution of this matter. The bankruptcy trustee, charged with the duty of collecting the estate assets and expeditiously closing the estates, cannot distribute the proceeds of the Second Sale to creditors without first securing a declaration that Clark is the owner of the Clark Claim or making some provision for Clark's post-petition indemnification. Thus this court necessarily has the power to resolve the dispute among the parties concerning ownership of the Clark Claim.[3]

Another point need be made. Clark urged that the Debtors are necessary parties to the Clark Action, in which CRI alleges that the Debtors transferred the Clark Claim to Pandora Industries or its designee. If Clark be correct, the Debtors cannot be joined without leave of this court, for 28 U.S.C. § 959(a) allows suit against debtors in possession and trustees of estate property without leave of the bankruptcy court "with respect to any of their acts or transactions in carrying on business connected with such property." The dispute here, whether the Clark Claim was sold to CRI or Clark, or whether, if sold to CRI, its sale should be abrogated, does not arise out of an act or transaction in carrying on business. Rather, the dispute centers on the meaning of an order of this court and the integrity of a sale before this court. Accordingly, the district court may be without power to fully adjudicate the controversy before it.

It is with good reason that 28 U.S.C. § 959(a) is limited as it is. For interpretation of a court order relating to the administration of the estate is best performed by the court issuing the order. This was explained aptly in *Shores v. Hendy Realization Co.,* 133 F.2d 738 (9th Cir.1943), a reorganization proceeding under section 77A and 77B of the former Bankruptcy Act, where it was held that the district court sitting in reorganization had jurisdiction to enjoin a state court action which impinged on the reorganization even though the district court in its order confirming the plan had not explicitly retained jurisdiction to do so.

Here, the plan was not in fact completely executed when the decree was entered. The question attempted to be litigated in the state court was whether the directors, in making the stock distributions to the management, had acted in conformity with the approved plan, or, to put it in a negative way, whether they were not undertaking to do something which the court had decreed should not be done. The question was one of interpretation. It involved the administration of the plan itself. The court best equipped as well as the one properly entitled to resolve disputes of that kind was the court in which the proceeding had been conducted. As to fundamental questions of interpretation and adminis-

---

**3.** Whether the dispute once repleaded will involve a core or noncore matter need not be addressed now. A bankruptcy court can issue a preliminary injunction even in a noncore, related matter because the injunction is not a final order. *Guy C. Long, Inc. v. Dependable Ins. Co. (In re Guy C. Long, Inc.),* 74 B.R. 939, 942 n. 5 (Bankr.E.D.Pa.1987).

tration such as these we think the jurisdiction of the bankruptcy court continues whether future consideration of them was expressly reserved or not. Otherwise, interpretations at war with each other no less than with the decree itself may well result. (footnote omitted) 133 F.2d at 741.

In summary, an injunction is necessary for two reasons: to preserve the *status quo* to allow this court the opportunity to consider whether, as alleged, the First Sale was permeated by the fraud of an insider; and to allow this court to declare the meaning of the First Order, a determination which, if favorable to Clark, will terminate the need for an escrow and aid in the liquidation of these estates. Accordingly, the motion for a preliminary injunction pursuant to 11 U.S.C. § 105(a) is granted, without prejudice to an application by CRI to terminate the injunction if the trustee of the Debtors' estates does not replead the motion first pressed by the Committee within 60 days.

Clark's order to show cause also seeks to have CRI and CRI's counsel jointly and severally pay all costs, expenses and attorneys' fees which have been or will be incurred by Clark in connection with this action and the district court action pursuant to 28 U.S.C. § 1927. Sanctions are inappropriate, at least at this time. Section 1927 provides that sanctions may be imposed against anyone who unreasonably and vexatiously multiplies the proceedings in any case. Even though this court has concluded that a preliminary injunction is appropriate, it is possible that CRI will prevail on the merits and the Clark Action will have to be tried. It cannot be said at this time that the District Court was clearly an improper forum for that action.

Settle order in accordance with this opinion.