## In re BIG RIVERS ELECTRIC CORPORATION, Debtor.

### Bankruptcy No. 96–41168.

United States Bankruptcy Court, W.D. Kentucky, Louisville Division.

Jan. 12, 1998.

Michael A. Florella, Felicia S. Turner, Sullivan, Mountjoy, Stainbeck & Miller,

Owensboro, KY, Mark S. Kaufman, Laura F. Nix, Russell A. Tolley, Long, Aldridge & Norman, Atlanta, GA, for Big Rivers.

James G. Bruen, Jr., Genevieve Holm, U.S. Dept. of Justice, Civil Division, Comm. Lit. Branch, Washington, D.C., for Rural Utilities Service.

Mark Thompson, Scott W. Brinkman, Frank P. Doheny, Jr., Mike Grady, Simpson, Thacker & Bartlett, New York City, Hirn, Dohney & Harper, Louisville, KY, for Chase Manhattan Bank.

Jeffrey L. Tanenbaum, Michelle A. Levitt, Weil, Gotshal & Manges, New York City, Joan Cooper, Barbara Edelman, Wyatt Tarrant & Combs, Louisville, KY, for Bank of New York.

Joseph J. Golden, Scott, Goldberg, Weil, Gotshal & Manges, Louisville, KY, for U.S. Trustee.

David C. Brown, W. Robinson Beard, Allison Wade, Stites & Harbison, Louisville, KY, David H. Kleiman, James P. Moloy, Dan Peek, Dann, Pecar, Newman & Kleiman, Indianapolis, IN, for Alcan Aluminum Corp. & Southwire Co. & its subsidiary NSA, Inc.

Charles W. Ritz, III, Alan C. Stout, Parr, Richey, Obermskey & Morton, Marion, KY, for Coops.

Richard C. Josephson, Stoel Rives, Portland OR, William R. Renner, Lexington, KY, for Pacificorp.

Paul Porter, Greenbaum, Doll, McDonald, Louisville, KY, for LG & E.

Richard Miller, Diane Coffino, Greenbaum, Doll, McDonald, New York City, for Dewey Ballantine.

## MEMORANDUM

J. WENDELL ROBERTS, Bankruptcy Judge.

This matter is presently before this Court on the following three claims: Claim # 135 filed by PacifiCorp Kentucky Energy Company, Claim # 133 filed by PacifiCorp Power Marketing, Inc., and Claim # 65 filed by PacifiCorp Power Marketing, Inc. In considering the allowance of these claims against the Big Rivers Electric Corporation (BREC) Bankruptcy Estate, this Court is faced with the following important questions: (1) how parties may contract, prepetition, to acquire the assets of a prospective debtor-in-possession; (2) the extent of a debtor-in-possession's fiduciary duty to the creditors and interest holders of a bankruptcy estate; (3) the ability of an unsuccessful bidder to obtain an 11 U.S.C. § 503 administrative claim against the estate; and (4) Kentucky contract law concerning the enforcement of a contract containing a "no-shop" provision. By agreement of the parties, these three claims have been submitted to the Court for a decision on the pleadings.

### FACTUAL BACKGROUND

The facts surrounding BREC's unfortunate journey to this Court have been recounted, in forest destroying detail, in previous decisions of this Court and will not be repeated in this Memorandum. Instead, we shall consider the Debtor's relationship with PacifiCorp Power Marketing, Inc. ("PPM"), PacifiCorp Kentucky Energy Company ("PKEC") and PacifiCorp Holdings, Inc. ("PCH") (collectively "PacCorp Entities").

Prior to its Chapter 11, BREC began what it called its "Resolution Process" in an effort to resolve all of its financial difficulties. As part of that process, it negotiated with several entities concerning the sale or other use of its facilities for an amount which BREC hoped would be sufficient to pay its creditors. In January 1996, BREC entered into a letter of intent with PCH whereby the PacCorp Entities would acquire most of BREC's assets under a "lease" transaction.

On or about March 8, 1996, BREC entered into an Interim Wholesale Marketing Assistance Agreement with PPM ("IWMAA"). The IWMAA forms the basis of PPM's $423,948.95 pre-petition unse-

cured claim (No.65), filed with this Court on February 4, 1997. No party has objected to PPM's claim in this amount.

On August 29, 1996, BREC and PKEC executed the "Omnibus Agreement" ("Agreement") (a copy of which is attached as attachment "A"). The underlying purpose of the Agreement was to permit PKEC to operate BREC's power generation plants, as well as a generator plant owned by the City of Henderson, Kentucky, but operated by BREC (collectively generation assets), and to market the power produced from those plants, particularly the power in excess of the needs of BREC customers. In return for the use of BREC's generation assets, the PacCorp Entities were to make payments to BREC, including a share of the power marketing profits. The Agreement also contemplated BREC and the PacCorp Entities entering into a separate Power Marketing Agreement for the sale of BREC power.

Among the terms of the Agreement between PKEC and BREC were the following:

Section 5.4 *No Negotiations with Others,* which provided:

Except with prior written consent of PKEC, Big Rivers shall, at all times after the approvals described in Section 8.6 [approval of Big Rivers Board] have been obtained, refrain from (a) initiating or soliciting any inquiries or making any proposals with respect to, or engaging in negotiations concerning, or (b) except as required by a court of competent jurisdiction, providing to any person (other than a governmental entity) any confidential information relating to, any business combination with Big Rivers or any lease, acquisition or purchase of all or any significant portion of the Assets.[1]

Section 6.3 *Reasonable Efforts,* which provided:

Each party will use reasonable efforts to effect the transactions contemplated by this Agreement and the remaining Transaction Agreements and to fulfill the conditions to the obligations of the Parties set forth in Article VII or VIII of this Agreement.

Section 6.4 *Bankruptcy Filing,* which provided:

The parties acknowledge and agree that Big Rivers may commence a bankruptcy case under Chapter 11 of the United States Code ("Bankruptcy Case") prior to the Effective Date, but that the commencement of any such Bankruptcy Case will not constitute a breach or default under or violation of this Agreement. The parties further acknowledge and agree that any breach or default under or violation of any material contract, commitment, understanding, arrangement, agreement, or restriction of any kind or character to which Big Rivers is a party or by which Big Rivers or any of the Assets may be bound or affected, which breach, default or violation arises solely as a result of the commencement of any Bankruptcy Case, shall not constitute a violation of this Agreement.

Section 11.4 *Governing Law,* which provided:

This Agreement shall be governed and interpreted in accordance with the internal laws of the Commonwealth of Kentucky.

Finally, and most importantly, the Agreement provided in Sections 7.17 and 8.18 that, as a condition precedent to both PKEC's and BREC's obligations under the Agreement, this Court would have to approve the transactions contemplated by the Agreement "in a form and substance" reasonably satisfactory to PKEC and BREC.

---

**1.** This clause has repeatedly been referred to as the "No–Shop Clause" throughout this proceeding.

On September 25, 1996, BREC filed its Chapter 11 proceeding with this Court. At the time of the filing, neither BREC nor the PacCorp Entities disclosed the existence of the No–Shop Clause, or filed a copy of the Agreement in the record.[2] Shortly thereafter, on January 22, 1997, BREC filed a Disclosure Statement and Plan of Reorganization ("PKEC Plan") with this Court. This Plan proposed to consummate the transactions set forth in the Agreement. Contained within the numerous exhibits to the Disclosure Statement and Plan was a copy of the Agreement.

On February 4, 1997, in furtherance of the PKEC's Plan, BREC filed a Motion to Extend the Exclusivity Period through the conclusion of a confirmation hearing and requested that a Disclosure Statement Hearing be set by the Court.

After BREC filed the Exclusivity Motion, LG & E Energy Corp. ("LG & E") submitted a proposal to BREC which would purportedly pay BREC between $37,000,000.00 and $57,000,000.00 ("LG & E's offer") more than PKEC would pay under the Agreement. Seven days after receiving the LG & E offer, BREC refused to discuss the offer with LG & E citing the No–Shop Clause of the Agreement. (*See* Attachment "B", BREC's letter of February 14, 1997 to LG & E). Specifically, Big Rivers indicated that even discussing LG & E's offer, without PKEC's written consent, would be a violation of its duty to use its best efforts to close the transactions set forth under the Agreement.

On February 13, 1997, LG & E filed an Objection to the BREC Exclusivity Motion arguing, among other things, that BREC had not responded to LG & E's offer. After receiving BREC's letter of February 14, 1997, LG & E filed an Emergency Motion to (1) void the No–Shop Clause; (2) allow it to complete its due diligence

concerning a possible purchase of BREC's assets; and (3) establish a procedure to provide for an auction of the Debtor's assets. A hearing was set for February 19, 1997, on LG & E's Emergency Motion.

At the February 19 hearing, the Court preliminarily heard the parties relative to the status of the case. The principal issues the Court initially considered were: (1) whether BREC was obtaining the most value for its assets; and (2) whether all of BREC's Creditors consented to the terms of the PKEC Plan. The Court then entertained arguments for several hours concerning the balance of the issues in the LG & E Emergency Motion.

In opposition to LG & E's Motion, BREC strenuously argued that (1) the PKEC transaction should be approved, and (2) the case should proceed to confirmation of the PKEC Plan. In taking that position, BREC defended both the resolution process and its selection of PKEC's bid. It did so because, at that time, it believed that the PKEC Transaction offered the best deal for its primary creditor groups and other parties in interest, and that its primary constituencies supported the PKEC Transaction. Indeed, some parties to the BREC bankruptcy, including Rural Utility Services ("RUS"), BREC's primary secured creditor, and the electric cooperatives which had formed BREC and which are its primary customers ("Member Cooperatives"), spoke in favor of the PKEC Transaction at the February 19 Hearing. However, Chase Manhattan Bank and the Bank of New York (collectively "Banks"), being BREC's largest Creditors after the RUS, took no position on the LG & E Motion.

Other Creditors of BREC were opposed to the PKEC Plan. Green River Coal, a Creditor then holding over $115 million in disputed unsecured claims, objected to setting a confirmation hearing date for the

---

**2.** Under the wording of the No–Shop Clause, BREC was contractually prohibited, without PKEC's written consent, to disclose to this Court the existence of the No–Shop Clause.

(Big Rivers shall .. refrain from ... providing ... any confidential business information relating to any business combination with Big Rivers ...).

PKEC Plan and supported an auction, as proposed by LG & E. Another significant player in the BREC bankruptcy, the City of Henderson, Kentucky, expressed concerns about the PKEC Plan. The City of Henderson had not reached an agreement with PKEC concerning the operations of its power plant, which was a necessary condition to the PKEC Transaction. LG & E, which was also an unsecured Creditor of BREC, supported an auction process, as did other potential bidders, who were present at the hearing.

The PacCorp Entities and PKEC flatly and forcefully opposed LG & E's Motion, with PKEC declaring that it refused to be a "stalking horse."[3] PKEC stated that if the Court ordered either an auction of the Debtor's property or any other bidding process, it would not extend the May 31, 1997 "drop dead" date under the Omnibus Agreement. This is significant because it was very likely that all of the transactions required under the PKEC Plan would not have closed by the May 31 deadline.

After hearing the evidence and arguments presented on February 19, 1997, the Court entered an Order, accompanied by a Memorandum–Opinion, dated February 21, 1997, establishing a "Bidding Process" for the Debtor's assets (a copy of the February 21, 1997 Bidding Process Order is attached hereto as Attachment "C"). The Court established this unique procedure in an effort to quickly and economically resolve the serious question of whether BREC was fulfilling its fiduciary duty to its Creditors and parties in interest to maximize the value of the bankruptcy estate. *See Commodity Futures Trading Commission v. Weintraub*, 471 U.S. 343, 354–355, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985); *In re Martin*, 91 F.3d 389, 394 (3rd Cir.1996). The Court was particularly concerned about the "No–Shop Clause" contained in the Agreement, which had been imposed on BREC by the PacCorp Entities. Under the express terms of that clause, BREC was contractually prohibited from attempting in any way to obtain a higher or better offer for its assets during its bankruptcy.

The Court's bidding process was designed to give any interested party a short period of time to complete its due diligence in order to make a competing bid for the Debtor's assets. Each bidder was required, as a condition of participating in the bidding, to agree to complete the PKEC Plan in the event PKEC terminated the Agreement or otherwise refused to complete the PKEC Plan. This process insured BREC, as well as its creditors and interest holders, of obtaining a deal at least equal to the PKEC Plan.

Finally, in the belief that PKEC should have some protection, this Court required all bids for the Debtor's assets to exceed the PKEC Plan by at least $10,000,000.00. The Bidding Process Order also prohibited BREC from proposing any Plan of Reorganization which did not contain the highest offer received as a result of the bidding process.

BREC originally appealed the Bidding Process Order and filed a Motion for a Stay Pending Appeal. However, after learning that most of its creditors and other primary constituents opposed BREC's appeal, it withdrew the Motion for a Stay and ultimately withdrew its appeal. Neither PKEC nor any other PacCorp entities appealed the auction Order.[4]

Under the terms of the Bidding Process Order, LG & E and one other interested

---

**3.** A "stalking horse" is a slang term in the world of bankruptcy reorganization for the first potential purchaser of a debtor's property whose offer may be used as a guide to additional bidding by other interested parties.

**4.** PKEC did file: (1) a Motion to Withdraw the Reference of the BREC case, which was overruled by the U.S. District Court for the Western District of Kentucky on March 18, 1997; and (2) Motions for the Recusal of the Undersigned and the Removal and Sanction of the Examiner. The Recusal and Removal Motions were denied by this Court on May 30, 1997. PKEC has appealed this Court's decision on the Recusal and Removal Motions.

bidder qualified to participate in the bidding process. The other bidder ultimately withdrew from the bidding process. The bidding process culminated in an auction conducted by this Court on March 19, 1997.

LG & E appeared at that time and submitted a qualifying bid under the terms of the Bidding Process Order. The LG & E bid offered $50,000,000.00 more in value to BREC creditors than did the PKEC Plan. PKEC attended the auction, but refused to participate in the bidding. At the conclusion of the bidding, this Court declared LG & E to have the best and highest bid. Accordingly, the Court directed BREC to file an Amended Plan and Disclosure Statement based on the LG & E bid. By a separate Order dated March 20, 1997, BREC was ordered to file the Amended Plan and Disclosure Statement by April 18, 1997. A Disclosure Statement hearing was established for May 12, 1997, and the Confirmation hearing was set for June 9, 1997. PKEC never appealed the March 20, 1997 Order.

After the entry of the March 20, 1997 Order, and despite the numerous efforts by the PacCorp Entities to destroy BREC's reorganization efforts, the parties in this case, with the assistance of Judge Dickinson of this Court and the Examiner, resolved their remaining disputes. On April 18, 1997, BREC filed its First Amended Plan of Reorganization, which was essentially a consensual plan. On June 9, 1997, the Amended Plan was confirmed by this Court's Order. Only the PacCorp Entities and one of the member cooperatives (which objected to preserve its rights before the Kentucky Public Service Commission concerning certain utility rate issues which are not important in this matter) objected to the Confirmation of the Plan. The Order of Confirmation specifically found that BREC "has no obligations to any of the PacifiCorp Entities under the PKEC Transaction Documents ..." The PacCorp Entities have appealed that Order of Confirmation.

On February 4, 1997, PPM filed an unsecured Proof of Claim (# 65) in the amount of $423,948.95. On June 5, 1997, PPM filed an Administrative Priority Claim under 11 U.S.C. § 503(b)(3) and (b)(4) (# 133) in the amount of $692,523.03. On July 3, 1997, PKEC filed a Claim for $25,000,000.00 (# 135). Numerous parties have objected to Claims # 133 and # 135.

## LEGAL ANALYSIS

Currently before the Court are two claims filed by PPM and one claim filed by PKEC. We will first discuss the PKEC claim:

### I. CLAIM NO. 135: PKEC's $25,-000,000.00 Claim ("Omnibus Agreement Claim").

The basis of PKEC's omnibus agreement claim is set forth in Exhibit "A" to PKEC's Proof of Claim No. 135 as follows:

On August 29, 1996, Big Rivers Electric Corporation ("Big Rivers") and PacifiCorp Kentucky Energy company ("PKEC") entered into the Omnibus Agreement, a copy of which is attached to this claim as Exhibit 1. The Omnibus Agreement remained executory as of September 25, 1996.

Upon the filing of the chapter 11 case the Omnibus Agreement became an executory contract of the Debtor. Unless one of the other events permitting termination specified in Section 9.1 of the agreement occurred, neither party could terminate the agreement unless the closing had not occurred by May 31, 1997. The agreement further provided, however, that a party whose failure to fulfill or perform any obligation under the agreement had been the cause of the failure of closing was not entitled to exercise such right of termination.

Big Rivers has not purported to terminate the agreement, and indeed it could not. First, none of the events specified in Sections 9.1(b), (d) or (f) giving Big Rivers the right to terminate have occurred. Second, Big Rivers can-

not terminate under section 9.1(e), because it is in breach of the agreement because Big Rivers failed to use reasonable efforts to fulfill its obligations to effect the transactions contemplated by the agreement and because it violated section 5.4 of the agreement obligating it to refrain from negotiations with third parties. Specifically, Debtor's failure to use reasonable efforts included filing the chapter 11 petition without an accompanying plan of reorganization based on the Omnibus Agreement, by failing to pursue its appeal, and request for stay pending appeal, of the bankruptcy court's order mandating an auction, and by filing a plan of reorganization that did not provide for consummation of the transactions provided for in the Omnibus Agreement. As a consequence, the Omnibus Agreement remains an executory contract of Big Rivers.

Normally, no claim with respect to the executory contract would need to be filed until it was either assumed or rejected. In this case, Big Rivers has expressly done neither. However, in light of Big Rivers' objection to any claims under the Omnibus Agreement and the order setting a bar date for filing claims by the PacifiCorp Entities, PKEC is filing this claim based on Big Rivers' repudiation of the Omnibus Agreement. Because of Big Rivers' actions PKEC has been deprived of the benefit of its bargain under the Omnibus Agreement and has been damaged in the amount of $25,000,000.

For the reasons set forth below, this Court finds that, as a matter of law, PKEC has no claim against BREC under the Omnibus Agreement.

### A. The Omnibus Agreement was not an Executory Contract.

The issue of what constitutes an Executory Contract has been a source of great debate both between scholars and various Federal Courts. *See, Andrew, Executory Contracts in Bankruptcy: Understanding Rejection*, 59 U.Colo.L.Rev. 845

(1988). However, Professor Countryman defines an executory contract for purposes of 11 U.S.C. § 365 as: "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." This is the test generally followed by the Sixth Circuit. *See In re Terrell*, 892 F.2d 469 (6th Cir. 1989).

In the present case, the Court is confronted with an unusual prepetition agreement between the parties. As noted above, the Agreement between BREC and PKEC was expressly conditioned upon the transactions contemplated by the Agreement being approved by the Bankruptcy Court. Further, both BREC and PKEC's performance under this Agreement were expressly conditioned upon this Court approving the transactions in question. (See Attachment A at Sections 7.17 and 8.18). Therefore, the Agreement between BREC and PKEC was clearly not an Executory Contract. Here, until the Bankruptcy Court approved the pre-petition Agreement, neither PKEC's nor BREC's failure to perform would give rise to a material breach of the Agreement. *See, generally, In re Wintex, Inc.*, 158 B.R. 540 (Bkrtcy. D.Mass.1992); *In re Silver Bros. Co., Inc.*, 179 B.R. 986 (Bkrtcy.D.N.H.1995); *In re John Lambert*, 54 B.R. 371 (Bkrtcy.D.N.H. 1985). *See also Markwell, The Case Against Breakup Fees in Bankruptcy*, 66 Am.Bankr., L.J. 349 (1992).

### B. BREC had no obligation under the Agreement until the transactions thereunder were approved by the Court.

The Agreement between BREC and PKEC contained an express condition precedent: this Court was required to approve the underlying transaction. That condition was never satisfied. Consequently, even assuming that the Agreement was an executory contract under 11 U.S.C. § 365, BREC had no liability under that Agreement.

■ Kentucky law clearly holds that if a condition precedent is not satisfied, the contract in question is not enforceable. *See Collings v. Scheen,* 415 S.W.2d 589 (Ky.1967) (if an express condition precedent cannot be satisfied, the contract is not enforceable and the parties are not liable for damages); *Green River Steel Corp. v. Globe Erection Co.,* 294 S.W.2d 507 (Ky. 1956) ("A contract is made at the time when the last act necessary for its formation is done, ... The general rule is that where an agreement is made subject to the consent or approval of a third person, it must be looked on as a conditional agreement, dependent on such consent being given ... in default of which the agreement must be taken not to have become effective."); *Edwards v. Inman,* 566 S.W.2d 809 (Ky.App.1978) (Party whose contract to purchase real estate was expressly conditioned upon obtaining a loan, was excused from its obligations under the contract due to their inability to obtain a loan); *Horn v. Ranier,* 560 S.W.2d 233 (Ky.App.1977) (Court of Appeals affirmed Summary Judgment on coal contract for a percentage of gross coal sales where clear condition precedent to payments [use of a particular coal tipple in coal shipments] was not satisfied). Further, bankruptcy cases from other jurisdictions have held that if bankruptcy court approval is an express condition precedent to a contract, the contract is unenforceable absent the required bankruptcy court approval. *See Parker–Marshall Group, Inc. v. Lee,* 188 B.R. 297 (Bkrtcy.M.D.Fla.1995); *In re Wintex, Inc.,* 158 B.R. at 540; *In re Silver Bros. Co., Inc.,* 179 B.R. at 986; *In re John Lambert,* 54 B.R. at 371. *See also, Markwell, The Case Against Breakup Fees in Bankruptcy,* 66 Am.Bankr., L.J. 349, at 378 (1992).

Here, this Court holds that a prepetition agreement between a debtor and a third party, involving the sale, use or lease of the debtor's assets outside the ordinary course of the debtor's business, which is expressly conditioned upon a bankruptcy court's approval of the transaction is not enforceable against either party to the agreement *until* the bankruptcy court approves the transaction. This holding is consistent with Kentucky law, which has long held that parties to a contract are relieved of their obligations to perform under that contract if a condition precedent is not timely satisfied. *See Horn v. Ranier,* 560 S.W.2d at 233. Therefore, BREC has no liability to PKEC, or to any other party, under the Agreement.

## C. The Agreement between PKEC and BREC was void and unenforceable due to the No–Shop Clause.

Finally, PKEC has no claim under the Agreement against BREC, because the underlying purpose of the Agreement was to force BREC to grant PKEC a 25–year lease of its assets, while prohibiting BREC from fulfilling its fiduciary duty of maximizing the value of the bankruptcy estate for the benefit of BREC's creditors and other interest holders. This Court begins by discussing a debtor-in-possession's ("DIP") duties under the Bankruptcy Code.

### (1) BREC has a duty to maximize the bankruptcy estate's value.

■ It is beyond dispute that a Chapter 11 DIP owes a fiduciary duty to all of the creditors and other interest holders of its bankruptcy estate to maximize the value of the bankruptcy estate. *Commodity Futures Trading Comm'n. v. Weintraub,* 471 U.S. 343, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985); *In re Martin,* 91 F.3d 389 (3rd Cir.1996); *Consumer News and Business Channel Partnership v. Financial News Networks, Inc.,* 980 F.2d 165 (2d.Cir.1992); *In re Wintex, Inc.,* 158 B.R. 540 (D.Mass. 1992); *In re Bidermann Industries U.S.A., Inc.,* 203 B.R. 547 (Bkrtcy.S.D.N.Y. 1997); *In re Embrace Sys. Corp.,* 178 B.R. 112 (Bkrtcy.W.D.Mich.1995); *In re Landmark Park Plaza, Ltd.,* 167 B.R. 752 (Bkrtcy.D.Conn.1994); *Cello Bag Co. v. Champion International Corp.,* 99 B.R. 124 (Bkrtcy.N.D.Ga.1988). *See also,* Dunne, *The Revlon Duties and the Sale of Companies in Chapter 11,* 52 Business

Lawyer 1333 (1997); Note, *The Economic Case for Judicial Deference to Break-up Fee Agreements in Bankruptcy,* 13 Bank. Dev.J. 475 (1997); Ryland, *Bracing for the "Failure Boom" Should a Revlon Auction Duty Arise in Chapter 11,* 90 Col-umn.L.Rev. 2255 (1990). BREC, as a Chapter 11 debtor, owes this duty in the present case to all of its Chapter 11 con-stituencies.

### (2) *The No–Shop Clause forces the debtor to violate its fiduciary duty.*

■ In the present case, BREC has constantly argued that it believed that its proposed transaction with PKEC was the best deal available to it as a result of its Resolution Process. This determination, however, left BREC in a nearly impossible situation since the PacCorp Entities de-manded, as part of the Agreement, that BREC refuse to market or otherwise at-tempt to get a higher value for its assets in its contemplated Chapter 11 proceeding. Indeed, PKEC admits that its primary objective under the Agreement was to en-sure that its acquisition of BREC's assets would be unchallenged.

In a PKEC pleading it stated:

In a related assertion, Big Rivers con-tends that the PKEC proposal, as de-scribed in the Omnibus Agreement, was always subject to the risk of a higher and better proposal. Because PKEC knew that Big Rivers was contemplating a Chapter 11 bankruptcy filing in con-nection with the negotiations over the Omnibus Agreement, Big Rivers asserts that "PKEC was on notice that the PKEC Transaction would be tested against other proposals that might sur-face in the context of BREC's bankrupt-cy case." Big Rivers' Brief in Support of Objections, at 14.

On the contrary, PKEC urged the inclusion of the "reasonable efforts" clause to ensure that even if Big Rivers chose to pursue a Chapter 11 bankrupt-cy filing, PKEC would have a strong guarantee in place to avoid being de-prived of the benefit of its bargain un-der the Omnibus Agreement. Never-theless, as discussed above, Big Rivers did not adhere to the "reasonable ef-forts" clause, nor did Big Rivers fulfill its common law duty of doing "every-thing necessary" to effectuate the PKEC transaction. *Ranier,* 812 S.W.2d at 156 (emphasis added).

*Response of Pacificorp Kentucky Energy,* dated August 23, 1997 at p. 8.

The "No–Shop" Clause attempted to ful-fill the PacCorp entities objectives in a broad manner. Under the express terms of the Agreement, BREC could not negoti-ate any other agreement for the sale, use or transfer of its assets without the prior written consent of PKEC, even if autho-rized to do so by this Court. Indeed, under the No–Shop Clause, this Court could only order the Debtor to release information to third parties if the Court somehow found out about this Agreement. BREC, itself, was prohibited from asking the Court for permission to release infor-mation to other entities.

It is undisputed that PKEC specifically intended to prevent BREC from being able to fulfill its fiduciary duties as a Chap-ter 11 debtor by the No–Shop Clause. *Compare In re Bidermann Industries U.S.A., Inc.,* 203 B.R. 547 (Bkrtcy.S.D.N.Y. 1997) (Bankruptcy Court found a "window shop" clause, which did not prohibit the debtor from taking actions necessary to fulfill its DIP fiduciary duties, was still improper and set a show cause hearing on the question of whether a trustee or exam-iner should be appointed). PKEC knew that BREC was going to file a Chapter 11 petition as part of the consummation of the transactions contemplated by the Agree-ment.

BREC and its professionals may have thought they were fulfilling the fiduciary duty by accepting the "best" offer for its assets and entering into the Agreement with its "No–Shop" Clause, but PKEC

clearly wanted its deal to be the only transaction considered by this Court. As was noted by the Court in a "takeover" case, "some lock-up options may be beneficial . . . such as those that induce a bidder to compete for control of a corporation, while others may be harmful, such as those that effectively preclude bidders from competing with the optional bidder." *See generally Hanson Trust PLC v. ML SCM Acquisition, Inc.,* 781 F.2d 264, 274 (2nd Cir.1986). In this case, however, it is abundantly clear that the No–Shop provision was extremely harmful to BREC and its creditors, and resulted in requiring BREC to violate its fiduciary duty.

**(3)** ***Contracts requiring a fiduciary to breach its fiduciary duty are illegal and void under Kentucky and Bankruptcy law.***

The Kentucky law concerning the enforceability of illegal contracts has been eloquently summarized by the Sixth Circuit Court of Appeals, as follows:

> It is a well established rule that a contract against public policy cannot be made valid by ratification; and it has been said that where the object or tendency of a contract is to constitute a breach of duty on the part of one who stands in a confidential or fiduciary relationship, it is illegal and void, as tending to be, or being, a fraud on third persons. *Meguire v. Corwine,* 101 U.S. 108, 25 L.Ed. 899; *Forsyth v. Woods,* 11 Wall. 484, 485, 20 L.Ed. 207; *Horbach v. Coyle,* 2 F.2d 702; *Davezac v. Seiler,* 12 Ky.Law Rep. 599; *Young v. Evans,* 8 Ky.Law Rep. 353. Not only is it stated that such agreements are against the public policy of securing faithful discharge of duties by persons holding positions of trust and confidence, but agreement tending to cause unfaithful conduct by fiduciaries are illegal because they are, in effect, whose interest the fiduciaries have in charge; *Maine Northwestern Development Co. v. Northern Commercial Co.,* D.C. 213 F. 103.

*Kessler v. Jefferson Storage Corporation,* 125 F.2d 108 (6th Cir.1941).

In the instant case, the central purpose of the Agreement was to force BREC to breach its fiduciary duty to maximize the value of its bankruptcy estate by preventing BREC from "marketing" its assets after the execution of the Agreement. Thus, the Agreement is illegal under Kentucky law, and as such, is therefore null and void. Consequently, PKEC has no claim against BREC under that Agreement.

It is important to note that while the Court finds the Agreement is an illegal contract, the Court is not called upon, nor does it presently find that either BREC or its professionals breached their fiduciary duty by entering into the Agreement. As discussed above, PKEC forced BREC into this position by its insistence on the No–Shop Clause as a condition of the execution of the Agreement. While this Court may question whether the Agreement was actually the best deal for BREC, it does not question the good faith of BREC or its professionals in determining that the Agreement, even with the No–Shop Clause, was in the best interest of BREC. When faced with the economic pressures on BREC, it is easy to understand why it would accept the PKEC "bird in a hand" rather than enter the Chapter 11 wilderness without a deal.

PKEC, however, is not in the same position as BREC. PKEC could have requested either a reasonable break-up fee or some "topping" requirement to legitimately protect its deal with BREC as part of the Agreement. Instead, however, PKEC improperly tried to force BREC to complete the Agreement, without exposing it to the possibility of a better offer. This conduct of a prospective purchaser is intolerable.

In a similar case, *In re Bidermann Industries, U.S.A., Inc.,* 203 B.R. 547 (Bkrtcy.S.D.N.Y.1997), Judge Brozman found that a far less restrictive "window

shop" provision was an improper burden to be placed on a Chapter 11 debtor as part of a proposed purchase agreement. The Court explained:

> The fiduciary obligations of directors pervade bankruptcy administration. *Ross v. Kirschenbaum (In re Beck Industries, Inc.)*, 605 F.2d 624, 634 (2d Cir.1979). And the actions of the chief executive officer of the company are imbued with fiduciary obligations as well. *Id.* at 634–35. Some years ago I was faced with a dispute following a sale to the debtor's chief executive officer. Evidence had been presented that the insider had not revealed the existence or extent of certain assets which he had purchased from the debtors. *C & J Clark America, Inc. v. Carol Ruth, Inc. (In re Wingspread Corporation)*, 92 B.R. 87 (Bankr.S.D.N.Y.1988). As I explained there, sales to fiduciaries in Chapter 11 cases are not per se prohibited, "but [they] are necessarily subjected to heightened scrutiny because they are rife with the possibility of abuse." *Id.* at 93. Plainly, such careful inquiry is mandated here. Not only is Mr. Marsal a fiduciary by virtue of his position as chief executive officer, but he was hired by the debtors in possession (at a salary of $700,000 per year for himself and $350,000 for one of his colleagues) for his professional expertise in running troubled companies. By virtue of this latter role, he was placed in a position of trust and confidence so that, if there be any consequence at all, it is that his actions ought be subjected to a scrutiny even higher than that usually accorded the debtor's management.

> \*    \*    \*    \*    \*    \*

If the overall concept is questionable, then the bidding procedures are nothing short of incomprehensible. How could the debtors possibly agree not to encourage other offers in the face of an insider sale where a large part of A & M's equity contribution is to come from a success fee (if approved by the court) paid to the firm by one of the purchasers? Nothing could paint a more accurate picture of Mr. Marsal's conflict than that intended success fee. This sale process should have followed an intensive effort to drum up the best price obtainable for the creditors. Instead, the process aims to cut off other possible sales. There is some window-dressing, making it look like the sale will be tested, for the so-called "window shop" provision allows the debtors to fulfill their fiduciary obligations by permitting due diligence to occur by others with offers exceeding the claimed value of the A & M/Vestar offer. However, the offers have to be made first, without benefit of any dialogue with the debtors or Mr. Marsal, a state of affairs which is not optimally calculated to generate the best price obtainable. This permission for due diligence by others is small solace indeed, particularly since it is Mr. Marsal who, with his professional expertise, undoubtedly will be analyzing any competing offers should the unlikely occur and an offer be made. Moreover, Mr. Marsal testified that if I were to approve the letter agreement, it is unlikely that competing offers would be received.

\*    \*    \*    \*    \*    \*

... And the whole bidding arrangement is designed not to encourage but to stifle bidding. Unlike in *Integrated*, where the debtors communicated with some 30 potential bidders and the chosen bidder was a "magnet" for the others, the debtors here did not negotiate with third party prospective purchasers, pick the best of them and then proceed to seek approval for topping and expense reimbursement fees. Rather, they determined to proceed with a management-led buy out where their chief executive officer and their majority shareholder may acquire equity in and salaries from the acquiring enterprise. When the "window shop" provision and the indemnification of Vestar are added to the equation, it can be seen that the aim is

not to foster bidding. Significantly, discussions with the 30 potential bidders preceded the debtor's entry into the window shop clause in Integrated Resources. Not so here.

*Id.* at 551–553.

In this case, there has been no insider self dealing as there was in *Bidermann.* Nevertheless, there is a "No–Shop Clause" which makes the corresponding *Bidermann* provisions look like an auction sale contract. In *Bidermann,* there was at least an express provision which would allow the debtor to fulfill its fiduciary duties. Here, the Agreement expressly *prohibits* BREC from even petitioning this Court to allow negotiations in the event a better offer were proposed.

■ In summary, this Court holds that PKEC has no claim against BREC under the Agreement, as that contract is illegal and void as a matter of law.[5] The Court does not hold as a matter of law that *all* restrictions on a debtor's ability to market its assets are illegal in cases involving the sale or other use of a debtor's assets. This Court does, however, hold that, at a minimum, any such clauses must be subject to the strictest scrutiny by a Bankruptcy Court before the process of approving the underlying transaction begins. The debtor must demonstrate that the inclusion of a "window shop" clause, or similar clause, in an agreement provides a significant benefit to the debtor, which would not be realized absent the "window shop" clause. *See generally, In re SNA Nut Company,* 186 B.R. 98 (Bankr.N.D.Ill. 1995).

■ Here, the "No–Shop" Clause did not benefit BREC. Rather, the Clause prevented it from fostering competitive bidding between other interested parties. This Court, therefore, holds that No–Shop Clauses, such as this one, which prohibit a debtor from fulfilling its fiduciary duties are *per se* illegal in Chapter 11 proceed-

ings. *See Bidermann,* 203 B.R. at 552–53 ("[T]he whole bidding arrangement is designed not to encourage but to stifle bidding.")

**II. Claim # 65. PPM $423,948.95 Prepetition Unsecured Claim Under the Power Marketing Agreement.**

In the present case, numerous parties hotly contest both PKEC's claim under the Agreement and PPM's claim under 11 U.S.C. § 503(b)(3) and (4). However, no party has objected into PPM's prepetition claim under the Power Marketing Agreement. Accordingly, it shall be allowed in the amount of $423,948.95.

**III. Claim # 133. PPM Administrative Expense Claim Under 11 U.S.C. § 503(b)(3) and (b)(4).**

■ Section 503(b) of The Bankruptcy Code provides as follows:

(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—

(3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by—

(D) a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under Section 1102 of this title, in making a substantial contribution in a case under Chapter 9 or 11 of this title;

(4) reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under paragraph (3) of this subsection, based on the time, the nature, the extent and the value of such services, and the cost of comparable services other than in a case under this title, and reim-

---

5. In light of this determination, the Court shall not address the questions of whether BREC breached the Agreement by not using its reasonable efforts to have the transactions contemplated by the Agreement approved by this Court.

bursement for actual, necessary expenses incurred by such attorney or accountant;

The primary issue presented by Claim # 133 in this case is whether, as a matter of law, PPM is precluded from asserting, under 11 U.S.C. § 503, that it is entitled to an administrative priority claim for making a "substantial contribution" to BREC bankruptcy estate. This Court finds that, as a matter of law, PPM cannot assert an 11 U.S.C. § 503 substantial contribution claim.

As this Court has discussed in detail above, the purpose of the "No-shop" provision inserted by the PacCorp Entities in the Agreement with BREC was to prevent BREC from fulfilling its fiducial obligation, by prohibiting BREC from attempting to maximize the value of its assets. Even under the law most favorable to PPM, *In re DP Partners, Ltd.*, 106 F.3d 667 (5th Cir.1997), PPM is not entitled to an administrative claim, as this Court holds that *none* of the efforts of PPM or any other PacCorp Entities enhanced in any way the reorganization of the BREC estate. PPM and the other PacCorp Entities worked long and hard to *prevent* the Debtor from marketing its assets and obtaining the highest value for the creditors and other parties in interest. This course of action alone bars PPM from asserting a substantial contribution administrative claim.

## CONCLUSION

PKEC and the other PacCorp Entities have throughout this case viewed the BREC Chapter 11 proceeding as a vehicle under which they could acquire BREC assets free of the claims of any creditors without having to expose their deal to the offers of competing buyers. If the BREC Chapter 11 had been a "pre-pack" plan which had been agreed to by *all* classes of creditors, this course of action *might* have been acceptable. However, in a contested Chapter 11 proceeding, PKEC's "No-Shop" Clause is nothing more than an illegal attempt to control BREC for the sole benefit of PKEC and the other Pac-Corp Entities. This Court did not approve of these tactics and ordered the Bidding Process to ensure that BREC maximized the value of its bankruptcy estate. The Court shall not now reward PacCorp by approving these claims. A separate Order reflecting these findings shall be entered with this Opinion.