In re ADELPHIA COMMUNICATIONS CORP., et al., Debtors.

Adelphia Communications Corp., et al., Plaintiffs,

v.

John Rigas, et al., Defendants.

Bankruptcy No. 02–41729 (REG).

Adversary No. 02–8051(REG).

United States Bankruptcy Court, S.D. New York.

May 15, 2003.

338

Dilworth Paxson, LLP, by Lawrence G. McMichael, Christine Callahan, Philadelphia, PA, for Defendants John Rigas, Michael Rigas, Timothy Rigas and other Rigas related parties.

Cozen O'Connor, by Edward Hayum, Wilmington, DE, for Defendant Peter L. Venetis.

James B. Comey, United States Attorney, by Judd C. Lawler, Assistant U.S. Attorney, New York City, for Intervenor, United States of America.

Anthony Ostlund & Baer, P.A., by Jeff Ross, Minneapolis, MN, for State Court Plaintiffs AIG DKR Soundshore Holdings, Ltd. et al.

Boies, Schiller & Flexner, LLP, by Eric Brenner, Phillip C. Korologos, Armonk, NY, Counsel for Plaintiff Adelphia Communications Corp.

Kasowitz, Benson, Torres & Friedman, LLP, by Michelle Fivel, New York City, for Intervenor, the Official Committee of Unsecured Creditors of Adelphia Communications Corp.

Sidley Austin Brown & Wood, LLP, by Jerry L. Bregman, New York City, for Intervenor, Official Committee of Equity Security Holders of Adelphia Communications Corp.

Morgan Lewis & Bockius, LLP, by Randi B. Guest, New York City, for Erland Kailbourne.

## DECISION ON MOTION FOR EMERGENCY RELIEF STAYING DISCOVERY IN STATE COURT ACTION

ROBERT E. GERBER, Bankruptcy Judge.

In this adversary proceeding under the umbrella of the chapter 11 cases of debtor Adelphia Communications Corporation and its subsidiaries ("Adelphia"), plaintiff Adelphia asserts claims against defendants John Rigas, members of his family, and entities they control (the "Rigas Defendants") under RICO,[1] the Securities Exchange Act of 1934 (the "'34 Act"),[2] and common law. The Rigas Defendants, who have previously moved to dismiss the '34 Act claims under Fed.R.Civ.P. 12(b)(6), now move, under one of the Securities Litigation Uniform Standards Act ("SLUSA") amendments to the '34 Act,[3] '34 Act section 21D ("Section 21D"),[4] and section 105(a) of the Bankruptcy Code,[5] for a stay of discovery in an action in New York state court (the "State Court Action")[6] asserting claims under, *inter alia*, the Securities Act of 1933 (the "'33 Act").

For the reasons that follow, a stay of the state court discovery will be granted, under each of the '34 Act Section 21D and Bankruptcy Code section 105(a), subject to reconsideration (and possible vacatur) after the determination of the now-pending motions to dismiss the '34 Act claims in this case; the conclusion of the criminal

---

1. 18 U.S.C. § 1961 et seq.

2. 15 U.S.C. § 78a et seq.

3. Pub.L. 105–353 (1998).

4. Section 21D(b)(3)(D), 15 U.S.C. § 78u–4(b)(3)(D).

5. 11 U.S.C. § 105(a).

6. *AIG DKR Soundshore Holdings, Ltd. et al. v. Kailbourne, et al.,* Supreme Court of the State of New York, Index No. 11790/02 (2003).

proceedings now pending against the Rigas defendants; or the vacatur of any meaningful number of the discovery stays in the other 50 cases pending across the country against the Rigas Defendants, in which discovery likewise has been stayed.

The following represents the Court's Findings of Fact and Conclusions of Law with respect to the requested stay.

## Facts

The facts relevant to the requested stay are not in dispute.[7] Because this decision is in large measure fact-driven, the factual discussion is necessarily lengthy.

### A. Proceedings in the Federal Courts

#### 1. This Adversary Proceeding

This adversary proceeding, commenced on July 25, 2002 (one month after the June 25, 2002 filing of the bulk of Adelphia's chapter 11 cases), is one of approximately 50 actions pending against the Rigas Defendants in state and federal courts around the country, alleging a variety of claims under the federal securities laws, RICO and common law in connection with their management of Adelphia. As relevant here, Count IX of Adelphia's adversary complaint seeks damages from the Rigas Defendants under Section 10(b) of the '34 Act, and Rule 10b–5 promulgated thereunder, in connection with Adelphia's financial statements, most notably those in its 10–K and 10–Q filings.[8]

On August 26, 2002, upon an application by Adelphia, this Court issued a temporary restraining order ("TRO") in this adversary proceeding (the "August 2002 TRO"), which has continued in effect, enjoining the Rigas Defendants from disposing of certain real property in which Adelphia claims an interest.[9] Thereafter, on November 26, 2002, upon another application by Adelphia, this Court issued a second, and broader, TRO in this adversary proceeding (the "November 2002 TRO") freezing all of the assets of the Rigas Defendants, except for those necessary to pay identified operating expenses of companies the Rigas Defendants control, living expenses, and legal fees.

On September 18, 2002, the Rigas Defendants, among others, moved for an order of the district court "withdrawing the reference" with respect to this adversary proceeding—i.e., undoing the reference from the district court to the bankruptcy court of this adversary proceeding that was effected immediately and automatically upon the filing of the adversary proceeding by the debtor Adelphia. That motion has since been briefed, and is pending in the district court. On November 25, 2002, this Court issued a decision and order granting the motions of the Official Committee of Unsecured Creditors ("Creditors' Committee") and Official Committee of Equity Security Holders ("Equity Committee") in the umbrella

---

7. Accordingly, an evidentiary hearing was not required.

8. Adv. Pro. Cmpl. ¶ 221.

9. In an early determination in connection with that request, this Court noted that "if any more than a bare minimum of the allegations that have been made turn out to be true, we will here be faced with very major breaches of fiduciary duty." Oral Decision, Tr. of Hrg. of Aug 26, 2002 (ECF # 881, Exh. 4), quoted in *Adelphia Communications Corp. v.*

*Associated Electric & Gas Insurance Services, Ltd.* (*In re Adelphia Communications Corp.*), 285 B.R. 580, 595 n. 21 (Bankr.S.D.N.Y.2002) (determining controversies with respect to access to, and litigation over, directors' and officers' liability insurance policies) (the *"D & O Policies Decision"*). But the Court also observed, in the *D & O Policies Decision*, that "[t]he fact that allegations have not been proven is more than a technical consideration[ ]. . . ." *Id.*

chapter 11 cases to intervene in this adversary proceeding, and providing guidance as to their rights as intervenors. *See Adelphia Communications Corp. v. Rigas (In re Adelphia Communications Corp.),* 285 B.R. 848 (Bankr.S.D.N.Y.2002).

On January 17, 2003, the Rigas Defendants moved to dismiss, *inter alia,* the '34 Act claims asserted against them in Adelphia's amended complaint here.[10] The briefing of those motions is in progress. It is not yet clear whether the motions to dismiss will be determined by this Court or the district court; the answer to that may turn on the timing and substance of any decision with respect to the Rigas Defendants' motion to withdraw the reference. Under another subsection of Section 21D,[11] discovery in this adversary proceeding is stayed pending the determination of the motions to dismiss.

*2. The Criminal Proceedings.*

On September 23, 2002, John Rigas, Timothy Rigas, Michael Rigas, James Brown and Michael Mulcahey were indicted in the Southern District of New York. The indictment charges them with 24 counts of conspiracy, securities fraud, wire fraud, and bank fraud, in connection with allegedly materially false Adelphia financial statements, alleged defrauding the investing public, and alleged looting of Adelphia. Thereafter, James Brown pled guilty to the criminal charges levied against him. The criminal trial is scheduled to commence in January 2004.

On January 22, 2003, the United States Attorney for the Southern District of New York, on behalf of the United States of America (the "Government"), moved to intervene and to stay certain of the discovery in this adversary proceeding, principally contending that each was necessary to avoid prejudice to the Government's pending criminal action, by reason of depositions being taken of potential government witnesses.[12] By a decision dictated into the record at the conclusion of a hearing on the matter, on February 3, 2003, confirmed by order dated February 10, 2003,[13] this Court, *inter alia,* granted the stay of discovery that the Government had requested. Among other things, this order stayed, until the criminal prosecution was completed, discovery of all potential Government witnesses, including, most significantly, Adelphia directors and Brown, whose deposition testimony had been sought by the Rigas Defendants.

This Court noted, in connection with that ruling, in relevant part:

Judge Leisure's decision in [*SEC v.*] *Downe* [1993 WL 22126 (S.D.N.Y.1993)] shows how the courts balance the needs to be served. . . .

(Tr. of Hr'g of 2/4/03 at 112). Further:

As Judge Leisure said in *Downe,* . . . "Judicial discretion and procedural flexibility should be utilized to prevent the rules and polices applicable to one suit from doing violence to those pertaining to the other."

*Id.* at 113. Further:

At Page 14 [of his decision in *Downe*], Judge Leisure noted that he would

---

**10.** Adv. Pro. 02–8051, ECF Docket # 69.

**11.** Section 21D(b)(3)(B), 15 U.S.C. § 78u(b)(3)(B).

**12.** However, one of the reasons the Government argued that a stay of discovery was appropriate was "to enhance judicial economy and the efficiency of resolving all of the

parallel civil proceedings." Govt. Mem. of 3/14/03, Adv. Pro. No. 03–2017(REG), ECF Docket # 24, citing Govt. Mem. of 1/22/03, Adv. Pro. 02–8051(REG), ECF Docket # 78.

**13.** Adv. Pro. 02–8051(REG), ECF Docket # 90.

weigh "the competing interests of the various parties." I think I need to do that here....

*Id.* at 114. And finally:

Another factor that I take into account and, by far, the most important factor, is the prejudice to the Rigas Defendants in this adversary proceeding....

I am reasonably comfortable that the Rigas defense [in this adversary proceeding] would not be handicapped to a material degree by denying it the testimony of the independent directors and Brown under these circumstances....

*Id.* at 114–115 (transcription errors corrected).[14]

Since that time, Adelphia has acted with a sensitivity to the competing concerns, and has not sought to force the Rigas Defendants to testify or invoke their Fifth Amendment privilege—even before discovery here was automatically stayed under Section 21D(b)(3)(B).

This Court was advised on this motion that Judges Hutton of the Eastern District of Pennsylvania (who has at least most of the 50 pending federal private actions) and Wood of the Southern District of New York (who has the SEC action) have stayed the discovery in the actions pending before each of them. The record is unclear as to whether they have done so by reason of the pendency of the criminal action, the pendency of motions to dismiss in federal litigation under the '33 or '34 Acts (though this would seem to be inapplicable in the SEC action), or both. It appears undisputed, however, that the State Court Action is the only one of approximately 50 civil litigations nationwide in which discovery has not been stayed.

### 3. Other Bankruptcy Court Proceedings

Disputes involving the effect of discovery on other proceedings—and in particular, balancing the needs of litigants in the bankruptcy court litigation with those of the Government—have arisen in other areas before this Court as well. Here too the Court has tried to balance the needs and concerns of the Government, the Rigases, Adelphia, and Adelphia's stakeholders.

#### (a) Schleyer/Cooper Employment

Earlier this year, in connection with Adelphia's contested January 21 motion, in the umbrella chapter 11 cases, to employ William Schleyer and Stephen Cooper as Chief Executive Officer and Chief Operating Officer,[15] respectively, the Equity Committee (which opposed Adelphia's motion) sought to depose Adelphia's "Carryover Directors" (explained below), and the Rigases (who opposed Adelphia's motion in part) wished to participate in that discovery as well. The Government had objections to that discovery similar to those discussed above.

These and other issues with respect to this motion led to several conference calls with the Court, and, ultimately, a stipulation, so ordered by this Court,[16] providing for limits on the matters that could be asked of the Carryover Directors, to address the Government's concerns.

---

**14.** The Court's correction of transcription errors here and elsewhere is without prejudice to the rights of parties to be heard with respect to the corrections. *See United States v. Zichettello,* 208 F.3d 72, 97–98 (2d Cir.2000).

**15.** Adelphia chapter 11 case Docket No. 02–41729, ECF Docket # 1326.

**16.** Stipulation and Order re Discovery in Connection with Debtors' Motion to Retain Executives, so ordered 2/19/03 (Adelphia chapter 11 case, Docket No. 02–41729, ECF Docket # 1410).

### (b) ML Media Partners v. Century/ML Cable Venture

Also before this Court is another adversary proceeding (the "Cable Venture Litigation"), an action between `ML Media L.P. ("ML Media"), on the one hand, and Century Communications Corp. ("Century"), an Adelphia indirect subsidiary; Highland Holdings, a partnership controlled by the Rigases; and Century/ML Cable Venture (the "Cable Venture"), a joint venture between ML Media and Century, on the other.

Pursuant to Fed.R.Civ.P. 26(f), the litigants held a discovery planning meeting, as to which Highland expressed concerns, as set forth in a March 13, 2003 letter filed with this Court as part of the parties' report.[17] Counsel for Highland noted her concern as to the proposed trial date, and noted in particular that Highland would be prejudiced by a trial before the criminal trial in light of the Rigases' Fifth Amendment rights. She also noted that several witnesses said to have information relevant to the dispute, whom she believed appropriately should be deposed, would be unavailable until after the criminal trial, by reason of the Government's position with respect to discovery in civil actions of its criminal trial witnesses.

As recently as May 12, 2003, in connection with Century's desire to submit an affidavit in connection with ML Media's motion—with respect to which it would have to consult the Government—this Court once more addressed its need to balance the needs and concerns of the Government, the Rigases, Adelphia and its stakeholders. This Court directed Century to caucus with the Government to accommodate those concerns, and announced its willingness to address any remaining disputes by conference call.

This Court has so far been able to temporize with respect to the balancing in the ML Media adversary proceeding, by reason of its ability to deal with threshold issues—motions to dismiss and for summary judgment—first.

### (c) Equity Committee Action

On January 9, 2003, the Official Committee of Equity Security Holders ("Equity Committee") commenced an adversary proceeding (the "Equity Committee Action")[18] seeking, *inter alia,* an order of this Court compelling Adelphia to call a meeting of shareholders, and the disqualification, for voting purposes, of the very substantial number of Adelphia shares held by members of the Rigas family, based on Equity Committee allegations that the Rigases had acted improperly. Each of the Equity Committee and the Rigases sought discovery of certain members of the Adelphia Board of Directors who had served during the time of incumbency of the Rigases, and who had stayed on the Adelphia Board after the Rigases resigned—colloquially called the "Carryover Directors," or sometimes "Holdover Directors." In connection with that motion (and especially the portion of it that would disqualify their shares from voting), the Rigases sought discovery of Carryover Directors to show that actions by the Rigases had been undertaken with the authorization and/or knowledge of the Adelphia Board.

Here too, the depositions sought by the Equity Committee and the Rigases engendered opposition by the Government. While such depositions would seemingly be relevant to aspects of the Equity Committee's adversary proceeding, depositions of

---

**17.** Adv. No. 02–2544(REG), ECF Docket # 92.

**18.** Adv. No. 03–2017(REG).

Carryover Directors (some or all of whom would be criminal trial witnesses) would also have the effect of providing the Rigases with broader discovery than that to which they would be entitled in their criminal case.

Accordingly, on March 7, 2003,[19] this Court permitted the Government to intervene in this adversary proceeding as well, to be heard with respect to the limitations of discovery it desired. One week later, on March 14, 2003, the Government moved to stay discovery in the Equity Committee Action.[20]

This matter, among others, was argued before this Court in a 3–hour hearing on April 7, 2003. In its decision,[21] dictated into the record at the conclusion of the hearing, this Court granted the Government's motion. But to balance the needs and concerns of the Equity Committee, those opposing the Equity Committee (principally, Adelphia and the Creditors' Committee), the Government, and the Rigases, this Court imposed a carefully crafted mechanism for dealing with the issues underlying the Equity Committee Action (principally by dealing with matters in phases), so as to work around needs for discovery that could "step on the toes" of the Equity Committee, the Government, or the Rigases.[22]

This Court noted, in connection with its ruling:

> I have to tell you that although I have ruled against Mr. McMichael [counsel for the Rigases] vis-a-vis granting the U.S. Attorney's Office's motion, *I have been and remain mindful of the consequences to his clients of requiring him to do anything more than we absolutely have to do on the factual front, because*

*if I am not going to give him discovery in that area, I want to protect his clients to the extent I can as a result.*

. . .

> What I call Phase 3 will be determined if Phase 1 or Phase 2 have not narrowed or clarified the issues. It will involve things such as whether the Rigas family has acted so badly that it should forfeit its rights, or the Carryover Directors are disabled from acting—these all being matters that I have considerable fears would step on the toes of the Government, and *as to these I don't see any alternative but to await resolution of the criminal proceedings.*

> If there is a way to deal with some or all of these issues without stepping on the toes of the Government, I welcome that, but I think the clear import of this ruling is I won't step on the toes of the Government.

> All right, that is the way we are going to proceed. This is a scheduling order in substance. Nevertheless, because you may regard this as involving your substantive rights—*because it does mean that we can't decide Phase 3 issues until after the conclusion of the criminal proceedings*—if anybody doesn't like this ruling and would like to have it in the form of an order from which one could seek leave to appeal, certainly I will enter an order of that sort.

(Tr. of Hr'g of 4/7/03 at 105–109) (transcription errors corrected; emphasis added).

Relevant to this, this Court continued:

> The underlying theory under all of this is there is a lot of stuff here. *I don't know how far we could get before the*

**19.** Equity Comm. Adv. Pro. ECF Docket # 22.

**20.** Equity Comm. Adv. Pro. ECF Docket # 23.

**21.** Tr. of Hrg. of 4/7/03 at 98.

**22.** *See Id.* at 101–102.

*conclusion of the criminal case,* but I don't want to be starting at zero at that point, but *this is in general to limit the prejudice to anyone* and meet the needs of the U.S. Attorney's office but to keep the ball rolling.

*Id.* at 111 (transcription errors corrected) (emphasis added).

Counsel for the Equity Committee followed up on that:

> MR. KINEL: Phase 3, I am not totally sure I understand Your Honor's ruling, but it sounds to me that Your Honor is indicating that the relief we are seeking vis-a-vis the Rigases could not be determined after the criminal trial?
>
> THE COURT: If it requires discovery from the Rigases or discovery that the Rigases might legitimately expect— and there is a reasonable standard to it, a reasonableness to defend itself. That is my ruling, and I understood your point that it could prejudice you, and that is one where I have simply ruled.

*Id.* (transcription errors corrected).[23]

### 4. Overview

As is apparent from the foregoing, counsel for the Rigas Defendants was quite correct when he noted, at oral argument at

the continued hearing on this motion, that this Court has strained, with considerable effort, and with lengthy hearings, conferences, and conference calls, to balance the needs and concerns of all of Adelphia, its stakeholders, the Government and the Rigas Defendants, and to maintain a level playing field as between them.

### B. Proceedings in the State Court

On August 9, 2002, AIG DKR Soundshore Holdings, Ltd. and a number of other business entities (together, the "AIG Plaintiffs") commenced the State Court Action. Their complaint asserts five causes of action, including claims under Section 11(a) of the '33 Act, in connection with their purchase, in the primary and secondary markets, of Adelphia notes and preferred stock;[24] under Section 12(a)(2) of the '33 Act, alleging that the Rigases were "sellers" of the notes and stock;[25] and under Section 15 of the '33 Act with respect to alleged control person liability.[26] Other causes of action assert liability under the Pennsylvania Blue Sky Law and for common law fraud.

The controversy now before this Court arose after the Government filed an application in the State Court Action to stay

---

**23.** Immediately thereafter, counsel for the Equity Committee sought the opportunity to address, by further briefing, the consequences of this Court's ruling, noting that the effect of this Court's ruling was that the parties "could try the matter for the next year but the ultimate relief has to wait until the outcome of the criminal trial." (*Id.* at 112). This Court responded by noting one aspect of the concerns it has been trying to balance:

> The problem I have, Mr. Kinel, how could I determine whether the Rigas family has acted badly, which is what you need to do, without giving them a chance to defend themselves?

*Id.* Counsel for the Equity Committee responded by suggesting that it could prove its case with respect to the Rigas shares by means other than Rigas testimony, and

without prejudging the issue, the Court expressed its willingness to consider whether the Equity Committee could prove its case in that way—without negatively impacting on the Government and the Rigases—stating:

> I will allow you to argue in Phase 1 whether you guys could get across the goal line based on that evidence. But I will give Mr. McMichael [counsel for the Rigases] a chance to be heard on that subject.

*Id.* at 113.

**24.** State Court Action Compl. ¶¶ 2, 50–63.

**25.** *Id.* ¶¶ 64–69.

**26.** *Id.* ¶¶ 70–71.

discovery in that court pending the resolution of the criminal action—an application substantially similar, if not identical, to the applications, described above, that had been made and granted in this Court. The plaintiffs in the state court action opposed the stay of the depositions.

When the Government's motion was heard in the State Court, the AIG Plaintiffs argued that it was "unusual in cases like this to ask for a stay or for a stay to be granted." [27] After referring to another matter before him, in which a defendant, before pleading guilty, was deposed and had asserted the Fifth Amendment when he was deposed,[28] the State Court then queried "Why should this case be different from other cases of similar nature in which the defendant in the civil case has been indicted for similar or the same conduct and is awaiting criminal action?" [29] The Government answered that "it's our view that this ... is not relief that is different from similar cases," and that "we are running around the Country trying to protect our trial witnesses from testimonial discovery." The Government continued:

In all those, at this moment, this is the only action in which discovery has been proposed as to our trial potential trial witnesses.

Discovery has been stayed in the SEC action [and] in the bankruptcy proceedings. So this is the only action that really threatens our witnesses.

*Id.* at 6.

After asking how the Government's witnesses would be threatened (and after the Government articulated, though at considerably lesser length, some of the same concerns that it had voiced to this Court), the State Court then stated:

Counselor, my suggestion to the plaintiffs is that they depose the defendants in the criminal action first. If the defendants in the criminal action take the Fifth Amendment, the plaintiff is going to move to strike the pleadings, and they will get a judgment, they won't have to depose anyone else.

*Id.* at 7.

At that point, counsel for the Rigases stated, "[w]hile I don't agree with what—with a lot of what Mr. Lawler [counsel for the Government] said, I agree with some of it. We will want discovery." [30] The State Court then said:

Counselor, I'm going to let the plaintiffs depose the defendants first in this case, and if the defendants take the Fifth Amendment there won't be a need for any further depositions, I'll tell you that right now, that will dispose of the case.

*Id.*

After having been informed by the Government that it did not oppose depositions of the Rigases going forward [31]—as contrasted to those of the Carryover Directors, whom the Rigases would normally have the right to depose first, under traditional priorities under the CPLR [32]—the State Court said, "Why don't we do that? If that disposes of the case, that solves

**27.** Tr. of Hrg. of 3/25/03 in State Court Action ("State Ct Hrg. Tr.") at 4–5.

**28.** State Ct. Hrg. Tr. at 5.

**29.** State Ct. Hrg. Tr. at 5–6.

**30.** State Ct. Hrg. Tr. at 6.

**31.** State Ct. Hrg. Tr. at 7.

**32.** "Ordinarily, the defendant is entitled to examine the plaintiff before the plaintiff gets a turn at the defendant." Siegel, *New York Practice*, § 354 at 552 (3d ed.2000). However, "this who-goes-first direction" can be varied by the court by order. *Id.*

your problem." [33]

The State Court—after noting expressly that it was "reversing the priority," and that Rigas motions to dismiss, which had been "pending for some time," would be decided after the depositions [34]—ordered the depositions of the Rigases to be taken within 30 days (the "State Court Order"), and adjourned the Government's motion.

The Rigases took an appeal from the State Court Order, and contending that they were forced to choose between asserting their Fifth Amendment rights and facing a $500 million default, sought a stay from the Appellate Division pending appeal. They were unsuccessful in securing the desired stay, and their appeal is now pending.[35]

### C. The Rigas Defendants' Application Here

The Rigas Defendants then brought the instant motion here, seeking an emergency stay of their depositions—then scheduled to proceed in a matter of days. Deeming their motion to be one for a TRO, the Court heard their application on the record and with telephonic notice, and after hearing opposing argument from the AIG Plaintiffs telephonically, entered a TRO until the matter could be heard on better notice and with full briefing.

After issuance of the TRO, the AIG Plaintiffs and Adelphia entered into an agreement in principle—which would be void if the Court granted the Rigases' motion—under which Adelphia agreed that it would not oppose depositions of the Rigas Defendants in the State Court Action.

While complex, the agreement provided in substance that (with a significant exception, to be discussed momentarily) until 60 days after the earlier of (i) a verdict against all of the defendants in the criminal action, or guilty pleas by all of them, or (ii) the Government's "complete withdrawal" of limits on Adelphia to proceed with its own depositions here, the AIG Plaintiffs would not seek to "obtain, perfect, or execute upon" a judgment against the Rigases in the State Court Action. Under that significant exception, however, the AIG Plaintiffs could earlier seek "a partial judgment solely as to liability," though such would not give them priority over Adelphia in connection with Adelphia's own claims against the Rigas Defendants. Each of Adelphia and the AIG Plaintiffs agreed to submit to "the jurisdiction of United States Bankruptcy Court for the Southern District of New York, Judge Robert E. Gerber," to resolve any disputes as to their relative priorities to Rigas assets should each secure judgments.

At oral argument at the continued hearing on the Rigas Defendants' motion, the AIG Plaintiffs stated further that if (as is likely) the Rigases invoked their Fifth

---

**33.** State Court Hrg. Tr. at 7.

**34.** The State Court stated in this connection, *inter alia*, "[t]he motion to dismiss doesn't stay depositions." (State Ct. Hrg. Tr. at 8). The Rigas Defendants contend that where claims are asserted under the '33 Act (as to which, unlike the '34 Act, state courts and federal courts have concurrent jurisdiction), the '33 Act's Section 27(b)(1), 15 U.S.C. § 77z–1(b)(1), by its terms, stays discovery, upon a motion to dismiss, wherever such claims are asserted—including state courts when the '33 Act claims are brought in state

court. That issue, as such, is not before this Court.

**35.** If, as the Court imagines, the Rigases continue to regard the State Court Order as erroneous, they would be well served to continue in that appeal. This Court's interests, in enforcing and implementing its earlier orders, are not at all congruent with those of the Rigases, and, as noted above and below, the stay this Court will enter will be subject to reconsideration, consistent with this Court's own needs and concerns.

Amendment privilege in the State Court Action and (again as is likely) sought to defend in the State Court Action with the aid of evidence provided by *others,* whom the Rigases could not then depose by reason of Government concerns, the AIG Plaintiffs would not then seek to secure a default judgment. That undertaking, so far as the record in this Court reflects, has not been presented to, or endorsed by, the State Court.

Finally, the Court notes that the Rigas Defendants have taken actions that the AIG Plaintiffs contend should constitute a waiver of any entitlement to a stay they might otherwise have. As noted, at the hearing before the State Court, the Rigas Defendants sought discovery of others, which this Court has repeatedly denied them here. And Rigas Defendant John Rigas gave an interview to the New York Times, reported on April 7, 2003, in which he expressed, at some length, his account and view of the relevant events.[36]

### Discussion

The Rigas Defendants, noting that they have pending motions to dismiss the '34 Act claims against them, argue that under the express terms of '34 Act Section 21D, they are entitled to the stay they seek. They further argue that the Court should grant the requested relief under section 105(a) as well. Their principal point in the latter regard—which no longer places great weight on Adelphia's reorganization needs, or an asserted duty to indemnify them—is that this Court has strained to maintain a level playing field with respect to discovery, and balancing parties' needs and concerns with respect to their Fifth Amendment rights, the Government's criminal case concerns, and, of course, the needs of Adelphia, the Creditors' Committee and the Equity Committee, and that the section 105(a) power should be utilized

to protect and implement this Court's earlier orders, and avoid a result inconsistent with all of those efforts.

The AIG Plaintiffs argue in response, principally, that:

(1) the Court lacks power under '34 Act Section 21D to stay the State Court Action, as that provision authorizes stays only of state court *class* actions;

(2) even if this Court has the power to enjoin a State Court Action that is not a class action, the Rigas Defendants have not made a "proper showing" for invocation of that power, as required under '34 Act Section 21D, as their situation does not present the considerations that Section 21D was enacted to address, and the Rigases waived the right to Section 21D relief when they themselves sought discovery in the State Court Action, and John Rigas granted an interview to the press; and that

(3) the AIG Plaintiffs' agreement in principle with ACC, under which they would limit themselves to getting a judgment as to liability, and they would submit to the jurisdiction of this Court with respect to competing claims for Rigas assets, obviates the need for section 105(a) relief, as any and all concerns from the perspective of this Court have been consensually addressed.

After addressing an important preliminary matter, the Court will then deal with its power to grant the requested relief under Section 21D and section 105(a), and then the matter of whether this Court should exercise any powers it has.

### I.

### Preliminary Matter—Rooker–Feldman

▮ At the outset, however, the Court must note what this motion is *not* about. This Court's views as to the wisdom of the State Court's action are imma-

---

**36.** Shammas Affirm. Exh. C.

terial to a motion of this character. Under the *Rooker–Feldman* doctrine,[37] and common sense, this Court cannot sit as a court of appeals with respect to a state court decision, and it is unnecessary and inappropriate for this Court to express any views as to it. The propriety of the State Court's decision may be considered only by the State of New York's Appellate Division, or, if their requirements are satisfied, the New York Court of Appeals or the United States Supreme Court.[38] This Court's authority is limited to the consideration of the relevant federal statutes— the Bankruptcy Code and the '34 Act— with a focus on its bankruptcy concerns in the underlying Adelphia chapter 11 cases and with respect to its earlier orders here, and the '34 Act claims in this adversary proceeding.[39]

Expressly recognizing that, the Rigas Defendants nevertheless argue in reply that the Court's exercise of its discretion to stay the State Court Action "should be informed by the propriety of the State Court's March 25 order." [40] They cite New York state law, some of it addressing federal constitutional concerns,[41] that would cast the propriety of the State Court Order in doubt, and argue in substance that the State Court Order is *so* wrong

that it should inform this Court's discretion in granting relief under federal law.

But this Court is reluctant to go down that road, for obvious reasons, which include, but are not limited to, circumvention of *Rooker–Feldman* and interests of federal-state relations. Especially since the Rigas Defendants invite the Court to consider the argument as an element of the Court's exercise of its discretion, the Court prefers, in the exercise of its discretion, not to express *any* view on the propriety of the State Court Order, even for the more limited (though more offensive) purpose the Rigas Defendants advocate. For the purposes of this motion, this Court assumes that the State Court Decision is as it is, and this Court limits itself to consideration of the *consequences* of that decision, in the context of matters that a federal judge must consider on a motion for a stay—principally, irreparable injury, balance of hardships, and effect on this Court's federal concerns.

## II.

### Power to Enjoin

**A. Power to Enjoin Under Section 21D**

■ Section 21D(b)(3) of the '34 Act provides, in relevant part:

---

**37.** *See Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923), and *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983); *In re Dabrowski,* 257 B.R. 394, 405–406 (Bankr.S.D.N.Y.2001) (Gerber, J.) (explaining *Rooker–Feldman* doctrine at greater length).

**38.** That includes the federal constitutional issues raised by an order subjecting the Rigas Defendants to default in the State Court Action if the Fifth Amendment is invoked. While those issues plainly raise a federal question, they cannot be heard by this Court, and the Rigas Defendants do not contend otherwise.

**39.** Just as this Court has no occasion to consider the state law issues, the state courts had no occasion to consider the federal law issues presented here. That includes, *inter alia,* consideration by the Appellate Division as to whether to grant a stay of discovery pending consideration of the Rigas' Defendants' appeal, which obviously did not involve either consideration of the application of '34 Act Section 21D; the propriety of relief under section 105(a); or the requirements for an injunction in the federal courts.

**40.** Rigas Def. Reply Br. at 7.

**41.** *See Steinbrecher v. Wapnick,* 24 N.Y.2d 354, 365–366, 300 N.Y.S.2d 555, 248 N.E.2d 419 (1969).

**(D) Circumvention of stay of discovery**

Upon a proper showing, a court may stay discovery proceedings in any private action in a State court, as necessary in aid of its jurisdiction, or to protect or effectuate its judgments, in an action subject to a stay of discovery pursuant to this paragraph.

15 U.S.C. § 78u–4(b)(3)(D).

The Rigas Defendants argue that this provision empowers this Court to stay discovery proceedings in the State Court Action. The Court agrees. The State Court action is, of course, a "private action in a State court," and this adversary proceeding, the action in which the stay has been sought, is "an action subject to a stay of discovery pursuant to this paragraph." [42]

However, in addition to arguing that they do not present the threat SLUSA was intended to address (a matter discussed below), the AIG plaintiffs contend that Section 21D(b)(3)(D) does not here apply at all. They contend, citing *In re Transcrypt International Securities Litigation,* 57 F.Supp.2d 836 (D.Neb.1999), that notwithstanding the words of Section 21D(b)(3)(D), this Court has the authority to stay discovery only in state court *class* actions, and thus cannot stay an individual action like the State Court Action here.

Though the AIG Plaintiffs' position is not as weak as it appears at first glance, the Court ultimately disagrees. By its terms, Section 21D(b)(3)(D) authorizes federal courts managing cases where discovery has been stayed before them to stay state court discovery "in *any* private action in a State court. . . ." (Emphasis added). It does *not* say any private "class action." And it is obvious that Congress knew the difference between class actions and civil actions generally, because in subsection (a) of Section 21D (enacted as part of the PSLRA amendments to the '34 Act in 1995, which SLUSA supplemented three years later), Congress enacted provisions applicable only to class actions, and in other subsections of that same Section 21D—see especially Sections 21D(b), 21D(c) and 21D(e)—it enacted provisions applicable in "any private action." [43]

The AIG Plaintiffs are correct in noting that the court in the *Transcrypt International Securities Litigation* held that notwithstanding its language, Section 21D(b)(3)(D) applies only to state court class actions. However, with respect (especially since, as the *Transcrypt International* court noted, *see* 57 F.Supp.2d at 837, the matter was one of first impression, and the *Transcrypt International* court was attempting to reconcile language in Section 21D that was very different

---

**42.** That is so because of another provision of '34 Act Section 21D, the Private Securities Litigation Reform Act ("PSLRA"). Section 21D(b)(3)(B) of the '34 Act, enacted as part of the PSLRA, provides:

  (B) Stay of discovery
  In any private action arising under this chapter, all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party.

A similar provision was added by the PSLRA to the '33 Act, under which the AIG Plaintiffs

assert their claims in the State Court Action. *See* '33 Act Section 27(b)(1), 15 USC § 77z–1(b)(1).

**43.** Of course, the class actions referred to in Section 21D(a) were those in *federal* court, and the AIG Plaintiffs' contention is that Section 21D(b)(4)(D) has an implied limitation to class actions in *state* court. However, the fact that Congress so plainly could say when it wanted its legislation to apply to class actions in Section 21D(a) makes it clear to this Court that Congress knew how to do likewise in any other instances where it intended to limit the reach of its legislation to class actions.

from the language used in SLUSA's statement of its purpose and legislative findings), this Court does not agree with *Transcrypt International's* ultimate result. The *Transcrypt International* court considered language in SLUSA's statement of its purpose [44] and in a "Findings" section of that legislation,[45] *see* 57 F.Supp.2d at 842, but the language there cannot trump, in this Court's view, the words of Section 21D(b)(3)(D) itself.

■ While the statements as to legislative purpose relied on by the *Transcrypt International* court plainly read as that court said they did, Section 21D(b)(3)(D)'s language could hardly be clearer, and the legislative history is insufficient, in this Court's view, to trump that clear language and reflect a Congressional intention to exclude non-class action litigation from the statute's reach. The Supreme Court has emphasized the importance of construing statutes in accordance with their unambiguous terms except in those rare cases where such would lead to a result demonstrably at odds with the intention of Congress. *See United States v. Ron Pair Enters.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989) (*"Ron Pair"*). As the Supreme Court stated in *Ron Pair:*

The plain meaning of legislation should be conclusive, except in the "rare cases

[in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters."

489 U.S. at 242, 109 S.Ct. 1026. *See also, e.g., In re Fischer*, 202 B.R. 341, 348 (E.D.N.Y.1996) ("[t]he prevailing rule of statutory construction requires the courts to follow the plain language of the statute, unless following such language would produce a result that is clearly at odds with Congress's intent"). In this case, there is nothing to cause this Court to believe that construing Section 21D(b)(3)(d) as written would be inconsistent with other federal statutory law or policy, or the intent of Congress.

As noted, the decision in the *Transcrypt International,* when rendered, addressed the matter as one of first impression. Since that time, several later courts considering the matter have come to disagree with the *Transcrypt International* result, and, so far as this Court can ascertain, no court has since construed Section 21D(b)(3)(D) as the *Transcrypt International* did. *See In re DPL Inc. Securities Litigation*, 247 F.Supp.2d 946, 948 n. 6 (S.D.Ohio 2003) (declining to follow *Transcrypt International,* as it was inconsistent with what Section 21D(b)(3)(D) "explicitly states");[46] *Newby v. Enron Corp.*, 2002

---

**44.** "To limit the conduct of securities class actions under State law, and for other purposes."

**45.** *See* Pub.L. 105–353 § 2 ("since enactment of [the Private Securities Litigation Reform Act of 1995 ('PSLRA')], considerable evidence has been presented to Congress that a number of securities class action lawsuits have shifted from Federal to State Courts"; "this shift has prevented that Act from fully achieving its objectives"; and "in order to prevent certain securities class action lawsuits alleging fraud from being used to frustrate the objectives of the Private Securities Litigation Reform Act of 1995, it is appropriate to enact national

standards for securities class action lawsuits involving nationally traded securities ...").

**46.** As the *DPL Securities Litigation* court stated in full with respect to this point:

In *In re Transcrypt International Securities Litigation*, 57 F.Supp.2d 836 (D.Neb.1999), the Court concluded that § 78u–4(b)(3)(D) applied only to class actions pending in state court. Since that statutory provision explicitly states that a District Court can stay discovery in "any private action" pending in such court, this Court declines to follow that court's interpretation of the statute.

247 F.Supp.2d at 948 n. 6.

WL 1001056, at *3 (S.D.Tex.2002) (expressly declining to follow *Transcrypt International,* though with discussion in lesser detail); *cf. In re BankAmerica Corp. Securities Litigation,* 263 F.3d 795, 802 (8th Cir.2001) (comparing *Transcrypt International* with A.C. Pritchard, *Constitutional Federalism, Individual Liberty, and the Securities Litigation Uniform Standards Act of 1998,* 78 Wash. U.L.Q. 435, 490 n. 267 (2000), and noting the latter's observation that the decision in *Transcrypt International* was "inconsistent with the text of the statute ... and negates the primary purpose of the provision.").[47]

For those reasons, and with considerable respect, this Court declines to follow *Transcrypt International* here. This Court construes Section 21D(b)(3)(D) to cover *any* private action in a state court.

*B. Power to Enjoin Under Section 105(a)*

Bankruptcy Code section 105(a) provides:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

■ It is indeed clear, as the Rigas Defendants argue, that under section 105(a), a bankruptcy court has the power to stay proceedings in other courts, including state courts. *See, e.g., In re L & S Industries, Inc.,* 989 F.2d 929, 932 (7th Cir.1993) (under section 105(a), "[a] bankruptcy court can enjoin proceedings in other courts when it is satisfied that such proceedings would defeat or impair its jurisdiction over the case before it"); *Garrity v. Leffler (In re Neuman),* 71 B.R. 567, 571 (S.D.N.Y.1987) (Sweet, D.J.) (section 105(a) "authorizes the Bankruptcy Court to stay proceedings in state court ..."; it is an "expressly authorized" exception to the Anti Injunction Act, 28 U.S.C. § 2283); *LTV Steel Co. v. Board of Education (In re Chateaugay Corp.),* 93 B.R. 26, 29 (S.D.N.Y.1988) (Leval, J.) ("A bankruptcy court may enjoin proceedings in other courts when it is satisfied that the proceedings would defeat or impair its jurisdiction with respect to a case before it"); *C. & J. Clark America, Inc. v. Carol Ruth, Inc., (In re Wingspread Corp.),* 92 B.R. 87, 92 (Bankr.S.D.N.Y.1988) (Brozman, J.) (same); *Tippins v. American General Finance, Inc. (In re Tippins),* 221 B.R. 11, 27 (Bankr.N.D.Ala.1998) ("It has been long recognized, however, that bankruptcy courts have the equitable power to enjoin state court proceedings to protect and enforce [their] decrees").

■ As Judge Sweet noted in *Neuman,* quoting an earlier edition of Collier,[48] "[t]he basic purpose of the section is to enable the court to do whatever is necessary to aid its jurisdiction, i.e., anything arising in or relating to a bankruptcy case." *Neuman,* 71 B.R. at 571.

*III.*

*Exercise of the Powers to Enjoin*

■ While the Court plainly has the power, under each of '34 Act Section 21D

---

47. The full discussion in *Pritchard* states:

The first case to construe this provision inexplicably declined to apply it to an individual state court securities action. *In re Transcrypt Int'l Sec. Litig.,* 57 F.Supp.2d 836 (D.Neb.1999). This decision is inconsistent with the text of the statute ("any private action") and negates the primary purpose of the provision.

48. *2 Collier on Bankruptcy* ¶ 105.02 (15th ed. Supp.1986).

and Bankruptcy Code section 105(a), to stay discovery in the state court, separate issues exist with respect to whether it should exercise that power. Even though the Rigas Defendants failed to bring matters to the attention of the State Court that might have obviated the need for an order of this Court, and, pursuant to their personal agendas, sought discovery and took actions that make them less than fully deserving of relief here, this Court, by reason of its own needs and concerns, believes that the discovery in the State Court Action should be stayed, under each of '34 Act Section 21D and Bankruptcy Code section 105.

While the concerns under the two statutes—particularly those relating to the avoidance of matters in derogation of this Court's jurisdiction—overlap in significant respects, the Court will, insofar as practicable, address them separately.

### A. 1934 Act Section 21D

■ As noted above, Section 21D(b)(3)(D) provides that "[u]pon a proper showing," in an action (like this one) subject to a stay of discovery under Section 21D, a federal court may stay discovery in a private action in a state court "as necessary in aid of its jurisdiction, or to protect or effectuate its judgments." It has been held that a "proper showing" would include evidence that a stay is necessary to protect the interests that the PSLRA was passed to protect. *See Lapicola v. Alternative Dual Fuels, Inc.*, 2002 U.S. Dist. LEXIS 5941 at *5, 2002 WL 531545 at *1 (N.D.Tex.2002).

■ One of those interests was to protect defendants from plaintiffs' use of discovery in a state court action to resuscitate claims that would not otherwise meet the heightened pleading standards for securities fraud actions, as enacted in the PSLRA. *See Lapicola*, 2002 U.S. Dist. LEXIS 5941 at *5, 2002 WL 531545 at *1. And it certainly appears to be true, as the AIG Plaintiffs argue, that this concern is not applicable here. But the AIG Plaintiffs fail to consider other reasons for which Congress enacted the SLUSA amendments that are very much applicable here, going to the fairness to defendants and the jurisdiction and judgments of the federal court.

One of the other interests that the PSLRA was passed to protect was "to prevent the imposition of *any unreasonable burden* on a defendant before disposition of a motion to dismiss...." *Lapicola*, 2002 U.S. Dist. LEXIS 5941 at *5, 2002 WL 531545 at *1 (emphasis added); *accord DPL Securities Litigation*, 247 F.Supp.2d at 950 (quoting *Lapicola*). That is a concern that is plainly applicable here, where motions to dismiss are pending in each of the federal and state courts, and the discovery burden on the defendant in the state court is the ultimate burden— a default judgment if, upon the taking of the defendant's deposition, a Fifth Amendment privilege is invoked.

And an interest that SLUSA itself, as an add-on to the PSLRA, advanced was the protection of federal court's orders, judgments, and jurisdiction. *See Lapicola*, 2002 U.S. Dist. LEXIS 5941 at *3, 2002 WL 531545 at *1 ("[t]he clear language of this statute [PSLRA, as amended by SLUSA] requires a defendant to make a 'proper showing' that a stay of discovery in the state court action is necessary to either: (1) aid the federal court's jurisdiction; or (2) protect or effectuate a federal court judgment").[49] This Court has dual con-

---

49. In *Lapicola*, the court accepted representations by the plaintiffs that they would not use any discovery obtained in the state court action to amend a separate complaint they had

cerns. It needs to avoid a scenario under which its jurisdiction to rule on the motions to dismiss the federal securities claims in this Court "will have been circumvented by discovery in the state court action[ ] and, therefore, compromised." *DPL Securities Litigation*, 247 F.Supp.2d at 949. But more importantly, this Court is loath to have its earlier orders—which succeeded, after considerable effort, in maintaining a level playing field, and in juggling the conflicting needs and concerns of Adelphia, its stakeholders, the Government and the Rigases—undercut by orders entered elsewhere without full knowledge of everything this Court was trying to do.

Considerations of these types have prompted several other federal courts to issue stays, under Section 21D, of discovery in state court actions where motions to dismiss in the federal actions were pending or imminent, even where the state court litigation did not, as here, also involve federal securities law claims. In the *DPL Securities Litigation, supra,* Chief Judge Rice of the district court, who had a number of '34 Act actions before him, stayed four state court derivative actions, alleging breaches of fiduciary duty by DPL's officers, directors and accountants. Motions to dismiss 10b–5 claims in the federal litigation had not yet been made, but were imminent. Even though, so far as the opinion reflects, none of the state court actions was particularly abusive, he stayed discovery in the state court actions, finding

the "proper showing" to have been made based on the considerations quoted above. He quoted, in connection with his ruling, a passage from the House Report at the time of the passage of SLUSA:

> *Because circumvention of the stay of discovery of the [PSLRA] is a key abuse that this legislation is designed to prevent, the Committee intends that courts use this provision liberally, so that the preservation of State court jurisdiction of limited individual securities fraud claims does not become a loophole through which the trial bar can engage in discovery not subject to the stay of the [PSLRA].*

*Id.* at 947 (emphasis in original).

One of the two reasons he found to support his conclusion that the requisite "proper showing" had been made is applicable here:[50]

> Herein, by staying discovery in the state court actions, this Court ensures that Plaintiffs will not burden Defendants with unreasonable discovery demands before this Court determines whether Plaintiffs' claims can survive a motion to dismiss. . . .

247 F.Supp.2d at 950.

Likewise, in *Newby, supra,* Judge Harmon stayed discovery in a Texas state court action, *Bullock v. Arthur Andersen LLP*, which was one of seven actions (the remainder of which, by the time of the decision, were pending in the federal

pending in federal court before a ruling on the defendants' motion to dismiss, 2002 WL 531545 at *1; the defendants had not presented any evidence that the state court discovery was unduly burdensome, *id.;* and the plaintiffs' state law claims did not mirror the federal claims. *Id.* Thus the *Lapicola* Court concluded that the claims asserted in the parallel state court action did not interfere with its jurisdiction or threaten its judgment in any way. *Id.* In each of these respects, those

considerations are either inapplicable or exactly the opposite here. Because *Lapicola* is distinguishable for at least those reasons, this Court need not consider whether it should squarely reject *Lapicola*, as Judge Harmon did in *Newby. See* n. 51 *infra.*

**50.** This Court sees no indication in the statute that to make a "proper showing," a party seeking a Section 21D(b)(3)(D) stay must show a need to address *each* of the ills that Congress sought to avoid.

courts) brought by a law firm with respect to alleged fraud in Enron. *See* 2002 WL 1001056 at *1, n. 1. *Bullock* had been removed to federal court (after the plaintiff's firm had secured an *ex parte* temporary restraining order—as it apparently had been successful in obtaining in other Texas state court actions, before they too were removed to the federal courts), but it had been remanded by one federal judge back to the state court. *Id.* As in the State Court here, the state court judge in *Bullock* took measures to expedite the proceedings before him. Although he was asked by defense counsel to set a schedule that would coordinate with the schedule set in the federal court in *Newby*, he instead granted a plaintiff's request "to set a more accelerated schedule." *Id.* The state court plaintiffs then proceeded with discovery requests, including requests for numerous documents and depositions.

In granting the stay in *Newby*, Judge Harmon articulated a number of concerns. One was that the plaintiffs in *Bullock* had undertaken massive discovery in that case, and that this was the same discovery that would be sought in the *Newby* cases if the motion to dismiss were denied. *Id.* at *2. She noted that Congress intended Section 21D(b)(3)(D) "to be used to stay discovery in situations in which state court proceedings are used to get around the automatic discovery stay provisions of the PSLRA." Here the State Court Order does not appear to have had that purpose, but it has that effect. After noting, as had the *DPL Securities Litigation* Court, the legislative history directive that "the Committee intends that courts use this provision liberal-

ly," *id.* at *2, and the substantial overlap in subject matter between *Bullock* and *Newby*, she ruled:

> In light of these circumstances, the Court finds that it is necessary in aid of its jurisdiction, and to protect and effectuate its judgments it is necessary to enjoin all discovery in *Bullock et al. v. Arthur Andersen L.L.P., et al.*, No. 32,-716, in the 21st Judicial District Court, Washington County, Texas until this court has ruled on a motion to dismiss in the *Newby* cases.

*Id.* at *3.[51]

The AIG Plaintiffs argue that *Newby* should be distinguished by reason of the egregious facts there, but this Court does not agree. Certainly, it appears to be true that the AIG Plaintiffs' conduct is not as offensive as the conduct Judge Harmon saw in *Newby*. But there is a key element that is the same—measures in the state court to achieve expedited results that materially impinge on the federal requirements of the PSLRA, and on orders in the federal courts with stayed '34 Act claims.

The AIG Plaintiffs rely on a case in this district, *Tobias Holdings, Inc. v. Bank United Corp.*, 177 F.Supp.2d 162 (S.D.N.Y. 2001), in which (in light of ambiguities in the PSLRA's reach) Judge Scheindlin of the district court in this district spoke of the legislative history of the PSLRA and a number of its purposes, several of which are inapplicable here. But one of the purposes, as Judge Scheindlin plainly stated, was "[t]o prevent the unnecessary imposition of discovery costs on defendants," *id.* at 165, and it is hardly a jump to find a

---

**51.** She added:

> The Court takes this action with full knowledge of the holdings in two district court cases, *Lapicola v. Alternative Dual Fuels, Inc.*, 2002 WL 531545 (N.D.Tex. April 5, 2002) and *In re Transcrypt Int'l Secs. Litig.*, 57 F.Supp.2d 836 (D.Neb.1999). The Court

> does not find these cases persuasive. Instead the Court finds that the Eighth Circuit in *In re BankAmerica Corporation Securities Litigation*, 263 F.3d 795, 802–803 (8th Cir. 2001) has the better reasoning and relies upon that case.
>
> *Id.*

purpose in the PSLRA and SLUSA in avoiding the unnecessary imposition of *other* burdens on defendants as well—or, as the matter was articulated by the *DPL Securities Litigation* court, in avoiding the imposition of "any unreasonable burden."

On its facts, *Tobias Holdings* has little application to this case. Judge Scheindlin there faced an action in which claims under the '34 Act were alleged, along with non-federal state law claims for fraud, breach of contract, conspiracy, and tortious interference with contract. With respect to the non-federal state law claims, the plaintiff there validly could assert diversity jurisdiction, as distinct from the federal question jurisdiction that would lie by reason of the '34 Act claims. Construing '34 Act Section 21D's subsection (b)—in contrast to subsection (d), as she had no need or occasion to stay a state court proceeding—she stayed discovery on the '34 Act claims, and the claim for common law fraud. But she declined to stay discovery on the breach of contract, conspiracy and tortious interference with contract claims—what she referred to as the "non-fraud common law claims," 177 F.Supp.2d at 165—concluding that PSLRA would not require such claims, asserted under diversity jurisdiction, to be stayed.[52]

Nothing in *Tobias Holdings* requires a different result here. Here the State Court had no occasion to carve out non-fraud claims from the federal securities law claims, as all of the claims asserted by the AIG Plaintiffs—whether under the '33 Act, the Pennsylvania Blue Sky law, or for common law fraud—were either claims under the federal securities laws or for one kind or another of fraud. And here it is

true, as the Rigas Defendants note in reply,[53] that the AIG Plaintiffs' state law securities and fraud claims mirror their federal securities claims, and neither the State Court nor this Court has been faced with the issue of whether state law non-fraud claims should be allowed to proceed.

As *Tobias Holdings* involves a materially different situation, and plainly is distinguishable on its facts, this Court does not need to address the Rigas Defendants' contention that *Tobias Holdings* was wrong, and/or in conflict with the majority of federal courts to address the issue, when it allowed discovery on non-fraud claims to proceed.[54]

### B. Bankruptcy Code Section 105(a)

The Rigas Defendants further argue that this Court should exercise its power to stay state court proceedings and stay discovery in the State Court Action under section 105(a). For reasons that overlap, in meaningful part, with those articulated above, the Court agrees.

This of course is not a case, like some, where present management of a debtor would be seriously distracted by its need to defend itself in plenary litigation, with a resulting detrimental effect on the debtor's ability to reorganize, or where a section 105(a) injunction is necessary to implement the section 362 stay. Nor is the possible duty on the part of the estate to honor an indemnification obligation (argued by the Rigas Defendants in their reply as an alternative basis for section 105(a) relief),[55] which is a pre-petition claim, sufficient, on the facts here, to warrant invocation of the section 105(a) power.

---

**52.** Notably, discovery with respect to the fraud claim, which presumably would have a substantial overlap with the '34 Act claims there, was stayed. *See* 177 F. Supp.2d at 165, 168–169.

**53.** Rigas Def. Reply Br. at 5.

**54.** Rigas Def. Reply Br. at 5.

**55.** Rigas Def. Reply Br. at 10–11

Rather, the Court regards invocation of the section 105(a) power to be appropriate for its own needs and concerns, and in particular, the protection of its jurisdiction and the implementation of its earlier orders. This Court has struggled, for a considerable time and with considerable effort, to maintain a level playing field *vis-a-vis* discovery in this adversary proceeding, in the two other (Cable Venture and Equity Committee) adversary proceedings, and in the underlying chapter 11 case—having entered numerous orders in this regard, described above, and having put an extraordinary amount of effort into balancing the discovery needs and concerns of no less than five feuding constituencies. That delicate balance is now at risk. Upsetting that balance was not, of course, the purpose of the State Court Order, but it was the effect, and this Court has a considerable interest in protecting its orders, and the balance it so far has been able to achieve—hopefully in a manner that the parties regard as fair and thoughtful.

█ Section 105(a) expressly authorizes bankruptcy courts to address such concerns even on their own motion; it provides, as previously noted:

No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination nec-

essary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

As Judge Brozman noted in *Wingspread,*

The bankruptcy court has broad equitable powers to protect and preserve its jurisdiction ... So broad is the court's power pursuant to section 105(a) that even where the Code states that an issue is to be raised by a party in interest, the statute may not be construed "to preclude the court from, *sua sponte,* taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to present an abuse of process."

92 B.R. at 92. This is not, of course, about any kind of intentional kind of abuse, but it is about entering orders that are not merely appropriate, but necessary, to maintain the balance this Court has worked so hard to achieve.

In that connection, this Court must make another observation. This Court's need to exercise these powers might have been avoided if the parties—not just the Rigases and the Government, but the AIG Plaintiffs as well (as at least several of them are members of the Equity Committee in Adelphia's chapter 11 case)—had advised the State Court of the relevant history, and the considerations discussed in this decision,[56] so that the State Court could act appropriately itself. One won-

---

**56.** The Court's observations in this respect were based on the record before it upon the motion. After the issuance of the Decision, the Government advised the Court by letter that its brief to the State Court had described the earlier proceedings in this Court and had extensively quoted this Court's decision of February 5. After examining the brief, which the Government included with its letter, this Court agrees with the former, and although it agrees with the latter as well, the Court notes that the passages that the Government quoted were those that addressed the Court's efforts to meet the Government's needs and con-

cerns, and to only a very limited extent were those that addressed this Court's similar efforts to meet the needs and concerns of the Rigases.

Likewise, the Rigas Defendants, by letter to the Court after the issuance of the Decision, advised the Court that they had no opportunity to advise the State Court orally on what transpired in this Court. Assuming that this is so, this Court notes that they nevertheless were seeking discovery in the State Court (not, so far as this Court can ascertain, limited to documents) that this Court had denied them here.

ders whether it is fair to be critical of the State Court when the State Court was not informed of all of this Court's orders and this Court's efforts, and, especially, when the Rigases themselves sought to use the State Court for discovery which this Court had twice disapproved, and which had triggered so many Government concerns.

The AIG Plaintiffs made a hardly frivolous point in connection with the Section 21D issues—which this Court considered not just in that context, but also in connection with its section 105(a) power—that this Court's exercise of its Section 21D(b)(3)(D) powers should be informed by the Rigases themselves having sought discovery in the State Court Action, and by John Rigas voluntarily having talked to the press and arguably having waived any rights he might have by speaking out to the public in that manner. This Court was troubled by both of those things, and came close to agreeing with the AIG Plaintiffs in this regard—particularly with respect to the Rigases' own efforts to secure discovery in the State Court Action, which this Court finds no less distasteful than the discovery in the other direction.

But ultimately this Court concluded that such should not be conclusive, because this Court on this motion, and as its predominant consideration, has been of the mind to implement its *own* needs and concerns. And frankly, if the parties here were dis-

qualified for seeking to advance their own private agendas, nobody would win.

Most of the constituencies whose needs and concerns this Court has strived to balance—and now the newcomer, the AIG Plaintiffs—have had their own private concerns and agendas. The Government, as it told the State Court, is perfectly willing to accept depositions of the Rigas defendants, so long as *its* trial witnesses are not deposed. The Rigas Defendants are willing to accept (and indeed would love) depositions of those who might be trial witnesses in their criminal trials, so long as the *Rigases* are not deposed—or, more realistically, forced to choose between asserting their Fifth Amendment privileges and taking a default in an action seeking $500 million from them. The AIG plaintiffs would like nothing better than to get a partial judgment as to liability against the Rigases, without having to prove their case. Ultimately, all of these agendas are of little interest to this Court, which likes to believe it has a more balanced perspective, and which is concerned solely with the implementation of federal policy with respect to the management of actions before it under the '34 Act; with what is fair and appropriate to facilitate reorganization; and with the protection of *its* jurisdiction and judgments. It is those concerns that underlie this Court's invocation of the section 105(a) power here.[57]

---

**57.** Other, lesser, factors also inform the Court's discretion in this regard.

The State Court Action is the only action, of the approximately 50 actions against the Rigas Defendants nationwide, in this Court and others, in which discovery has not likewise been stayed.

The Court would like to have at least the option to consider whether it can coordinate any future discovery, and/or other matters, with the many cases in the Eastern District of Pennsylvania, and, to the extent practicable, any other courts dealing with the same issues. *See Newby,* 2002 WL

1001056 at \*2 ("If *Bullock* or any other state court actions proceed independent of the *Newby* litigation, any coordinated efforts to resolve this litigation prior to a trial on the merits of these claims will be fruitless").

And the Court believes that while the agreement in principle between Adelphia and the AIG Plaintiffs partly addressed matters of concern to the Adelphia chapter 11 estate, it did not wholly ameliorate them. This Court believes that granting a judgment to the AIG Plaintiffs ahead of Adelphia *as to* liability, even though it did not also award

## IV.

### Injunctive Relief Issues ،

The remaining issues, involving considerations incident to an award of injunctive relief, require some, but not lengthy, discussion.

Neither the AIG Plaintiffs nor the Rigas Defendants spoke to whether the Court should consider the instant application under the requirements for a preliminary injunction, on the one hand (after determination of motions to dismiss and the conclusion of the criminal proceedings), or a permanent one, on the other. When this Court granted the Rigas Plaintiffs a TRO, and said that it would hold a continued hearing with respect to a further order after the AIG Plaintiffs had a lengthier notice and an opportunity to submit briefs and whatever else they wished, it assumed that the next hearing would be for a preliminary injunction, under Fed. R. Bankr.P. 7065, and Fed.R.Civ.P. 65(a), made applicable to bankruptcy adversary proceedings under Fed. R. Bankr.P. 7065. However, both sides approached the briefing and argument without addressing the traditional preliminary injunction criteria, choosing instead to deal with the propriety of application of the applicable statutes— '34 Act Section 21D and Bankruptcy Code section 105(a)—head-on. To cover its bases, the Court addresses the matter both ways; there is no difference in result.

If this stay application is deemed to be an application for a preliminary injunction, the Rigas Defendants, under the applicable standards,[58] have easily made the necessary showing. Their Hobson's choice of waiving their Fifth Amendment Rights, or suffering a $500 million default judgment (particularly in light of potential difficulties in bonding such a large judgment pending appeal), plainly establishes irreparable harm.[59] For the reasons discussed above, they likewise have shown at least a likelihood of success as to their efforts to invoke each of '34 Act Section 21D(b)(3)(D) and Bankruptcy Code 105(a). And while they have shown the requisite likelihood of success, and not just serious issues going to the merits (and therefore need not satisfy the alternate test for a preliminary injunction in the Second Circuit), the balance of hardships also tips decidedly in their favor. They face the risk of substantial and irreparable injury, as discussed above, and yet there is little or no prejudice to the AIG Plaintiffs. The AIG Plaintiffs would suffer no more than the same delays plaintiffs will "suffer" by the discovery stays in the other 50 litigations across the country, which are delays that Congress has determined are in the interests of sound public policy. And their stated willingness to defer securing a default judgment if, as expected, the Rigases invoke their Fifth Amendment rights and then seek to defend themselves by seeking

---

damages, could be detrimental to Adelphia, and put Adelphia's action in a catch-up situation that would be unfair to Adelphia here—especially since Adelphia will need to prove its case on the merits, and such might not be required in the State Court Action. If, as could be the case, each of Adelphia and the AIG Plaintiffs secured judgments and had to share a limited pot of Rigas Defendant assets, with Adelphia having been required to prove its case and with the AIG Plaintiffs having been spared the re-

sponsibility for proving theirs, this would be an additional matter for concern.

**58.** See, e.g., Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir.1979), and its progeny.

**59.** However, the usual grounds for injunctive relief, such as irreparable injury, need not be shown in a proceeding for an injunction under section 105(a). See Chateaugay, supra, 93 B.R. at 29; Neuman, supra, 71 B.R. at 571; Wingspread, supra, 92 B.R. at 92.

presently unobtainable depositions of Carryover Directors, suggests possible further delay in securing a judgment in any event, and further underscores the lack of material prejudice to them of a stay. The only real prejudice to them is the loss of the windfall of securing a judgment by default, and securing their judgment so far ahead of other plaintiffs with similar claims.

Deeming the Rigas Defendants' application to be one for a permanent injunction, the Rigas Defendants have also shown their entitlement to that. In this Court's view, they have shown, with respect to each of '34 Act Section 21D(b)(3)(a) and Bankruptcy Code section 105(a), not just a likelihood of success; they have shown an entitlement to a stay under each of those provisions, for the reasons discussed above.

## V.

### Conditions

By reason of the rationale underlying this decision, it necessarily must be subject to reconsideration—without prejudice to anyone's rights as to the outcome, in the event of any such reconsideration—if premises under which this decision was issued change. Since the stay of discovery now granted is dependent, in substantial part, on the pendency of motions to dismiss the '34 Act claims, this decision will be subject to reconsideration after those motions are decided. Since the stay is also dependent, in substantial part, on the pendency of the criminal proceedings, this decision will likewise be subject to reconsideration after verdicts or pleas are obtained in those proceedings. And since the Court's discretion was informed, though to a lesser degree, by the fact that discovery is not ongoing anywhere else, in any of the other 50 cases raising similar issues, this decision will be subject to reconsideration if that ceases to be true in any material way.

If any party believes that an event warranting reconsideration has transpired, and wishes to be heard with respect to reconsideration, he, she or it shall arrange a conference with the Court, or conference call, after first caucusing with other interested parties to see whether agreement as to procedures to be heard, and briefing schedules, can be reached.

### Conclusion

For the foregoing reasons, the Rigas Defendants' motion is granted, subject to reconsideration at the times described above. The Rigas Defendants shall settle an order in accordance with the foregoing, on notice to Adelphia, the Creditors' Committee, the Equity Committee, the Government and the AIG Defendants, on no less than two business days' notice by hand or fax.